ELIZABETH E.  KRUPA (krupae@sec.gov) Colorado Bar No. 26028
ALLISON HERREN LEE (leeah@sec.gov) Colorado Bar No. 28715
Attorneys for U.S. Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, Colorado 80202
Telephone:  (303) 844-1000
Facsimile:  (303) 844-1068

FILED

DEC 0 1 2006

CLERK

## UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>BART A. THIELBAR,<br>DAVID A. MONAGHAN,<br>KEITH W. BEACHLER,<br>JANA L. QUAM AND<br>CARY B. GRISWOLD<br><br>    Defendants. | **Civil Action Number:**  $O6-4053$<br><br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("Commission") for its complaint

alleges as follows:

## I.    SUMMARY OF THE ACTION

1.      Northwestern Communications Solutions ("NCS"), an operating division

of Northwestern Corporation ("Northwestern") recognized approximately $3.2 million of

unearned revenue during the fourth quarter of 2001 and the first two quarters of 2002,

and improperly reclassified $1 million of unsubstantiated assets to a goodwill account at the close of 2001 to avoid a year-end charge against income.

2.      The fraudulent accounting, subsequently uncovered by an internal audit at NCS during the summer of 2002, caused Northwestern to materially misstate its income during the fourth quarter of 2001 and the first and second quarters of 2002 in its public filings.

3.      During this time, NCS improperly recognized revenue through the intentional misuse of the percentage-of-completion accounting method for transactions at NCS in two ways: (a) estimated revenue from potential sales leads was improperly recorded as "work in progress" before a prospective customer had even agreed to the transaction; and (b) estimated revenue was improperly recorded on transactions (or "jobs") in percentage amounts far exceeding the actual percentage of completion of the work on the job.

4.      Defendants Bart A. Thielbar and Keith W. Beachler instructed Defendant Cary B. Griswold to make the fraudulent revenue entries during fourth quarter 2001 and the first and second quarters of 2002. During this time period, NCS improperly recorded $3.2 million out of a total of $4.2 million, or 76% of revenue recorded through the percentage-of-completion accounting method. Specifically, approximately $1.3 million in revenue was recorded on sales leads that had not closed at the time they were booked, and in fact never closed, and another approximately $1.9 million was recorded in periods before the revenue was earned.

5.      The improper revenue entries caused Northwestern to materially overstate its reported fourth quarter net income in financial statements accompanying its 2001

2

Form 10-K. The entries also caused NCS to exactly meet its targeted net income for 2001. The improper revenue entries in 2002 caused Northwestern to materially understate its reported first quarter net loss in financial statements accompanying its first quarter Form 10-Q, and to materially overstate its reported net income for the second quarter 2002 in financial statements accompanying its second quarter Form 10-Q.

6.      In the fourth quarter of 2001, NCS also avoided a $1 million charge against income by falsely reclassifying unsubstantiated inventory and other assets as a goodwill adjustment relating to NCS' prior acquisition of a company in December, 2000.

7.      Defendant David A. Monaghan, through his subordinate Jana L. Quam, instructed Defendant Cary B. Griswold to make the improper goodwill entry to avoid what should have been a $1,030,000 charge against income in the fourth quarter of 2001. Monaghan disregarded information provided and concerns expressed by Griswold about the entry, and insisted that the entry be made. This entry caused Northwestern to materially overstate its reported fourth quarter net income in financial statements accompanying its 2001 Form 10-K.

8.      Northwestern's financial statements for year-end 2001 and the first two quarters of 2002 were particularly important since they represented the most recent financial information published before Northwestern's registration of more than $800 million in securities offerings in the fall of 2002 at a time when the company was publicly struggling with its liquidity and cash flow.

## II.   JURISDICTION AND VENUE

9.      The Commission brings this action pursuant to the authority conferred

upon it by Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange

Act") [15 U.S.C. §§ 78u(d) and(e)] for an order permanently restraining and enjoining

Defendants and granting other equitable relief.

10.      This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(e) and 27

of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

11.      Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

12.      In connection with the transactions, acts, practices, and courses of

business described in this Complaint, Defendants, directly or indirectly, have made use of

the means or instrumentalities of interstate commerce, of the mails, of the facilities of a

national securities exchange, and/or of the means and instruments of transportation or

communication in interstate commerce.

13.      Northwestern's headquarters are located in this judicial district, and

Defendants Quam, Beachler and Griswold each reside in this judicial district.

Additionally, certain of the transactions, acts, practices and courses of business

constituting the violations of law alleged herein occurred within this judicial district.

## III.   DEFENDANTS

14.      Bart A. Thielbar is a resident of Luverne, Minnesota, and works in Sioux

Falls, South Dakota.  Although Thielbar held various executive titles, he functioned as

the chief executive officer ("CEO") of NCS from April 2000 until June 2002. In April 2000, Thielbar was appointed Vice President of Norcom Advanced Technologies, Inc., ("Norcom"), a wholly owned subsidiary of Northwestern that was included in the NCS operating division. In April 2001, Thielbar was also appointed Vice President of Northwestern Services Group, Inc., ("NSG") another wholly owned subsidiary of Northwestern Corporation, that oversaw the NCS operating division.

15.     Keith W. Beachler is a resident of Canton, South Dakota. Beachler served as Director of Operations at NCS from 2000 until late 2002, when he was promoted to Vice President. At all relevant times, Beachler reported to Defendant Thielbar.

16.     David A. Monaghan is a resident of Broken Arrow, Oklahoma. Monaghan served as Vice President of Finance, the most senior financial officer for Northwestern's utility subsidiary NSG, from January 2001 until June 2002. Monaghan served as the Vice President of Financial Planning and Reporting for NSG from June 2002 through July 2003. Monaghan has a Masters Degree in Accounting and became a certified public accountant ("CPA") in 1992. Monaghan's CPA license is currently inactive.

17.     Jana L. Quam is a resident of Sioux Falls, South Dakota. Quam served as Controller of NSG from June 1999 until June 2002. At all relevant times, Quam reported to Defendant Monaghan. Quam became a CPA in 1992, and her CPA license is currently inactive.

18.     Cary B. Griswold is a resident of Huron, South Dakota. Griswold was an employee of NSG, and the primary staff accountant serving NCS from approximately April 2001 until she left Northwestern in August 2003. At all relevant times, Griswold reported informally to Defendants Thielbar and Beachler, and formally to Monaghan and Quam. Griswold became a CPA in March 2001, and her CPA license is currently inactive.

## IV.    RELATED PARTIES

19.     **Northwestern Corporation** is headquartered in Sioux Falls, South Dakota, and operates a regulated utility business in South Dakota, Nebraska, and Montana.  At all relevant times, Northwestern's common stock was registered with the Commission pursuant to Exchange Act Section 12(b) and the company filed annual, quarterly and current reports with the Commission.  During 2002, Northwestern made public offerings of its securities.  Until September 12, 2003, Northwestern's common stock traded on the New York Stock Exchange ("NYSE").  On September 15, 2003, Northwestern filed for Chapter 11 bankruptcy protection, and the NYSE suspended trading in the stock.  Northwestern emerged from bankruptcy in November 2004.

20.     **Northwestern Communications Solutions (NCS)** was an operating division of NSG, the wholly owned subsidiary of Northwestern Corporation that conducted Northwestern's utility operations.  The NCS operating division consisted of a legal entity known as Norcom Advanced Technologies, Inc. ("Norcom") as well as the assets of Lines of Communication, Inc. ("LOC"), which NSG purchased in 2000.  NSG operated the assets of Norcom and LOC together as one operating division it referred to as NCS.

## V.    SUMMARY OF VIOLATIONS AND RELIEF SOUGHT

21.     Defendants Thielbar and Beachler violated  Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) [15 U.S.C. § 78j(b)] and 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 10b-5 [17 C.F.R. § 240.10b-5] and 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder.  Defendant Thielbar aided and abetted Northwestern's violations of Sections 10(b) of the Exchange Act [15 U.S.C. § 78j(b)],

and Defendants Thielbar and Beachler aided and abetted Northwestern's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), and 78m(b)(2)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13] thereunder, and unless restrained and enjoined will violate or aid and abet violations of such provisions.

22.     Defendant Monaghan violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Sections 10(b) [15 U.S.C. § 78j(b)] and 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 10b-5 [17 C.F.R. § 240.10b-5] and 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder, and aided and abetted Northwestern's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), and 78m(b)(2)] and Rules 12b-20, 13a-1 and 13a-11 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11] thereunder, and unless restrained and enjoined will violate or aid and abet violations of such provisions.

23.     Defendant Quam violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder, and aided and abetted Northwestern's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), and 78m(b)(2)] and Rules 12b-20, 13a-1 and 13a-11 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11] thereunder, and unless restrained and enjoined will violate or aid and abet violations of such provisions.

24.     Defendant Griswold violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder, and aided and abetted Northwestern's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), and 78m(b)(2)] and Rules 12b-20, 13a-1, 13a-

11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13] thereunder, and unless restrained and enjoined will violate or aid and abet violations of such provisions.

25.    The Commission also seeks an equitable order requiring Thielbar to disgorge all ill-gotten gains he obtained from his fraudulent conduct, including, but not limited to, all benefits from his employment at Northwestern such as his salary, bonuses, stock and other compensation, including pre-judgment and post-judgment interest.

26.    The Commission also seeks an order requiring Thielbar to pay third tier civil penalties pursuant to Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act [15 U.S.C. §§ 77t(d) and 78u(d)(3)].

27.    The Commission also seeks an order permanently barring Thielbar from serving as an officer and director of any public company pursuant to the equitable authority of the court, and Section 21(d)(2) of the Exchange Act, as amended [15 U.S.C. § 78u(d)(2)].

28.    The Commission also seeks an order requiring Monaghan to pay a $25,000 civil penalty pursuant to Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act [15 U.S.C. §§ 77t(d) and 78u(d)(3)], and an order requiring Griswold to pay a $10,000 civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## VI.    FACTS

### A.    **Background**

29.    Northwestern, formerly a Fortune 500 company, has operated a public utility business serving South Dakota and Nebraska since 1923.  In 2002, Northwestern

expanded its utility operations into Montana. Prior to its bankruptcy in September 2003, Northwestern had four primary business lines that operated through four separate subsidiaries – the utility (Northwestern's core business operated by NSG), a propane unit, a telecommunications unit, and a heating, ventilation and air-conditioning unit.

30.     NCS was an operating division of the Northwestern utility subsidiary NSG from 1997 through the second quarter of 2002, before the division was transferred to Northwestern's telecommunications subsidiary in the third quarter of 2002. NCS was in the business of selling, installing, and servicing telecommunications equipment for small and medium-sized businesses.

31.     NCS' sales transactions ranged from small equipment sales of a few hundred dollars to large installation jobs totaling several hundred thousand dollars. NCS had its own management, sales staff, and technicians.

32.     NCS maintained its own books and records, and prepared its own separate financial statements.

33.     Thielbar created and maintained an atmosphere of intimidation at NCS, putting tremendous pressure on the NCS staff, particularly Beachler, to meet or attempt to meet NCS' budgeted financial targets each month.

34.     Thielbar required Griswold to submit NCS' financial statements to him for review and approval each month before sending them to NSG. Accordingly, Griswold prepared, and Thielbar personally reviewed and approved, NCS' financial statements each month before Griswold finalized and forwarded them to NSG. NCS' financial statements were then consolidated into NSG's, and in turn NSG's financial statements were consolidated into Northwestern's. Each of the Defendants knew that NCS'

financial statements were ultimately consolidated into Northwestern's published financial statements.

35.     Northwestern discovered the financial fraud at NCS in the third quarter of 2002 after deciding to transfer NCS from NSG to Northwestern's telecommunications subsidiary.

36.     Internal auditors assigned to value NCS for purposes of the transfer discovered NCS' revenue misstatements and improper goodwill entry, as well as numerous other accounting misstatements.

**B.      The Revenue Misstatements**

37.     Throughout 2001 and the first two quarters of 2002, NCS purported to recognize revenue for many of its jobs using a percentage-of-completion accounting method.  The percentage-of-completion accounting method enables companies (performing certain types of projects and under certain circumstances) to recognize revenue while a job is in progress based on the amount of work performed, rather than waiting to recognize revenue until a job is substantially completed.

38.     The percentage-of-completion accounting method is appropriate for use only on jobs where work spans across financial reporting periods, and for which written contracts specifically document the rights and obligations between the parties during the term of the job.

39.     The majority of NCS' jobs did not involve written contracts and took less than one financial reporting period to complete.  NCS, therefore, should not have recognized any revenue on those jobs until equipment was delivered and, if required, installation was completed.

40.     Nevertheless, NCS purported to use the percentage-of-completion accounting method so that it could recognize revenue when, and in the amounts, it desired, while having it appear that this revenue was associated with actual work in progress.  In reality, NCS frequently had not yet begun any work on the "jobs" for which it recorded revenue, and, in many cases, never did any work, or sold any equipment, at all.

41.     NCS recognized estimated revenue from many alleged "jobs" while the transaction was still just a sales lead or prospect.  Because a number of these prospective jobs failed to materialize, NCS improperly recorded in its financial statements approximately $1.3 million of revenue for "jobs" where it never delivered any equipment or performed any services.

42.     NCS also arbitrarily chose how much profit to recognize immediately from jobs, frequently recording 90% to 100% of the estimated anticipated revenues and expenses as soon as it had, or hoped to have, a closed deal.  As a result, even as to jobs that did eventually close, NCS prematurely recorded in its financial statements an additional $1.9 million of revenue before it had been earned.

### i.     Overstatements During 2001

43.     NCS began recognizing revenue based upon a purported percentage-of-completion accounting method in late 2000 on a handful of jobs.  By early 2001, Defendants Thielbar and Beachler began instructing the former NCS controller to recognize revenue using this method for an increasing number of jobs.

44.      Defendants Thielbar and Beachler simply told the former NCS controller how much revenue to record on a purported job in a particular financial reporting period and frequently did not provide any supporting documentation.

45.      Uncomfortable with, among other things, the lack of internal controls relating to these procedures and other accounting practices at NCS, the former controller resigned in April 2001.

46.      After the former controller resigned, Defendant Griswold became the primary NCS accountant.  With the less-experienced Griswold as NCS' accountant, Defendants Thielbar and Beachler increased their use of percentage-of-completion revenue recognition, and it eventually became an end-of-the-month tool to inflate NCS' reported profits.

47.      Each month, Defendant Griswold prepared a preliminary income statement for NCS compiled from work that had actually been invoiced.  She then forwarded this preliminary income statement, along with a comparison to forecast, to Defendants Thielbar and Beachler and others.

48.      Upon receipt of the preliminary income statement, if NCS' financial results were short of forecast, Thielbar then demanded that the NCS sales staff provide him with information on any additional sales they had closed or *anticipated* closing. Thielbar, and sometimes Beachler, using this information, then improperly instructed Griswold to record additional estimated revenues on additional "jobs" before finalizing the income statement.

49.      Griswold often did not receive a signed contract or any other documentation for the purported additional jobs and revenue she recorded at month-end.

In addition, at the instruction of Thielbar, and sometimes Beachler, she often recorded 100% of the estimated revenue and costs for these jobs immediately, allowing NCS to recognize its entire profit from a job before performing any work.

50.    Thielbar and Beachler each knew or should have known that no commitment had been obtained from prospective customers on many of the "jobs" for which they instructed Griswold to record revenue.

51.    Thielbar and Beachler each knew that it was not proper to record revenue on jobs where no commitment had been obtained from prospective customers.

52.    Thielbar and Beachler each knew that they instructed Griswold to record percentages of estimated revenue on jobs without adequate justification or support, resulting in the recording of larger percentages than the amount that had actually been earned.

53.    Thielbar and Beachler each knew that it was not proper to record larger percentages of revenue on jobs than the amount that had actually been earned.

54.    After Griswold had recorded the additional revenue, she sent the revised NCS income statement to Thielbar for approval. Once Thielbar reviewed and approved the NCS income statement, Griswold sent it to Quam, Monaghan and others at NSG where it was consolidated into NSG's financial statements, and then consolidated into Northwestern's published financial statements.

55.    By late 2001, Griswold knew that the instructions she had received to record certain amounts of revenue through the percentage-of-completion accounting method were not accurate.

56.     In late 2001, Griswold made some effort to obtain more documentation for the revenue she was being instructed to record, but nevertheless continued, at the instruction of Thielbar, and sometimes Beachler, to record revenue on prospective jobs without first obtaining proper documentation evidencing commitments from customers. Griswold also continued to record inaccurate revenue through the percentage-of-completion accounting method without having obtained or analyzed documents reflecting the actual progress of jobs such as records reflecting actual labor costs incurred.

57.     By the end of its 2001 fiscal year, NCS had recorded about $2.6 million in revenue through its purported use of the percentage-of-completion accounting method, and approximately $2.1 million of that revenue was improperly recorded because it was based upon jobs that never actually occurred or on work that had not yet been performed. Thielbar's bonus for 2001 was based, in part, on NCS' fraudulent financial results.

58.     NCS' revenue overstatements caused a misstatement in Northwestern's net income and other line items for the fourth quarter of 2001, that was both quantitatively and qualitatively material.

### ii.     Overstatements During First and Second Quarters of 2002

59.     By the first quarter of 2002, the revenue NCS had recorded through its purported use of the percentage-of-completion accounting method had grown from $2.6 million to approximately $3 million.

60.     In approximately February or March 2002, Griswold confronted Thielbar with the fact that, through misuse of percentage-of-completion revenue recognition procedures, NCS had recorded in its financial statements more revenue than NCS had actually earned.

61.     In spite of Griswold's warning, Thielbar refused to authorize accounting entries correcting the unearned revenue that had previously been reported in NCS' financial statements.  Instead, Thielbar instructed Griswold and Beachler to simply monitor NCS' actual progress on work completed for jobs where revenue had been recognized prematurely through the percentage-of-completion accounting method, and to report to him on this progress at monthly meetings.

62.     Griswold and Beachler then prepared a report for Thielbar dated May 9, 2002 that showed, on a job-by-job basis, how much unearned revenue NCS had recognized.

63.     Among other things, the May 9, 2002 report prepared for Thielbar also reflected 31 different jobs for which revenue had been recognized based on an estimated "Probability of Closing" rather than commitments from customers.

64.     Even after receiving the May 9, 2002 report detailing that NCS had recorded more revenue than it had earned, Thielbar refused to authorize Griswold to make accounting entries to reverse the unearned revenue.  In fact, Thielbar and Beachler continued to provide Griswold with percentage-of-completion revenue recognition amounts for jobs without adequate justification or support, resulting in the continued improper recording of revenue.

65.     From the end of March 2002 (after Griswold warned Thielbar of the revenue problem) through the end of June 2002 (when Thielbar was transferred out of NCS), NCS recognized revenue for 41 additional jobs through the purported use of the percentage-of-completion accounting method.  Revenue for 36 of these jobs later had to be reversed in whole or in part.

66.     By June 30, 2002, NCS had recognized revenue for more than 60 jobs through its purported use of the percentage-of-completion accounting method, and the accumulated revenue associated with those jobs had grown from $3.0 million to $4.2 million.  Northwestern later determined that $3.2 million of that $4.2 million in revenue, or 76%, was improperly recorded because it was based upon jobs that never actually occurred or on work that had not yet been performed.

67.     NCS' revenue overstatements caused misstatements in Northwestern's net income, income before minority interests and other line items for the first quarter of 2002, in net income and other line items for the second quarter of 2002, and in net income before extraordinary item, and other line items for the first half of 2002, all of which were both quantitatively and qualitatively material.

## C.     The Improper Goodwill Entry

### i.      After a Division-Wide Reconciliation Project in 2001, Griswold Identified More Than $1 Million of Unsubstantiated Assets

68.     In December 2000, NSG acquired Lines of Communication, Inc. ("LOC"), a small telecommunications company located in Omaha, Nebraska.

69.     Monaghan led the financial due diligence for the purchase, and oversaw the recording of the initial accounting entries reflecting the purchase on NCS' financial statements.

70.     In recording the initial accounting entries, Monaghan and the due diligence team assessed and recorded the fair value for each of the LOC assets at the time of purchase.  The amount that the total purchase price exceeded the total fair value of the assets (less liabilities assumed) was recorded on NCS' balance sheet as goodwill associated with the LOC purchase.

71.     After the acquisition of LOC in December 2000, the LOC assets, together with the existing NCS assets, were then operated together as NCS.

72.     In or about April 2001, Griswold reported to Quam that NCS' general ledger and other accounting records were generally in poor condition.

73.     Quam instructed Griswold to reconcile all NCS general ledger accounts, which now included the former LOC accounts as well as the NCS accounts existing prior to the LOC acquisition (the "legacy" NCS accounts).

74.     Griswold performed the account reconciliations from April 2001 through February 2002.  Rather than writing off the unsubstantiated balances in the various accounts as they were identified, Quam instructed Griswold to place these balances in an asset holding account called the "obsolescence account."

75.     Griswold's reconciliation ultimately revealed large, unsubstantiated asset balances attributable to both legacy NCS accounts and former LOC accounts.  One particularly significant entry into the obsolescence holding account arose from an overstatement of NCS' inventory.  Of the approximately $800,000 reflected in the legacy NCS inventory account, only about $100,000 could be substantiated through a physical inventory.

76.     Accordingly, Griswold told Monaghan and Quam in an email dated February 13, 2002, that she had reclassified approximately $700,000 in the legacy NCS inventory account to the obsolescence holding account.  In the same email, Griswold specifically stated that legacy NCS inventory had been overstated and that the legacy NCS inventory was separate and distinct from the very small inventory previously

associated with LOC. Thus, Monaghan and Quam knew that a large portion of the obsolescence holding account had no relationship to the LOC acquisition.

77.     In February 2002, Griswold completed the account reconciliations and reported to Monaghan and Quam that the obsolescence holding account contained a net balance of more than $1 million of unsubstantiated assets.

### ii.     Monaghan Directed the Inappropriate Reclassification of Unsubstantiated Assets to Goodwill.

78.     Monaghan, Quam and Griswold each knew that the net $1 million unsubstantiated balance in the holding account should have been charged against fourth quarter 2001 income on Northwestern's income statement.

79.     However, to avoid this year-end charge, Monaghan, through Quam, instructed Griswold to reclassify the balance in the obsolescence holding account to goodwill, falsely indicating that NCS had discovered an error in the opening entries for the LOC acquisition that necessitated an increase in the goodwill arising from that acquisition.

80.     In fact, Monaghan, Quam and Griswold each knew that a large portion of the balance in the obsolescence holding account arose from legacy NCS accounts and therefore was entirely unrelated to the LOC acquisition. Monaghan, Quam and Griswold further knew that Griswold had not even examined or considered the opening entries for the LOC acquisition in conducting her reconciliation process, and thus had not identified whether there were any errors in these entries. Therefore, Monaghan, Quam and Griswold each knew that it was not appropriate to reclassify the obsolescence account balance as goodwill relating to the LOC acquisition.

81.     At or around the time Griswold made the entries reclassifying the $1 million net obsolescence account balance to goodwill, Griswold told Quam, and at least one other colleague, that she was not comfortable with Monaghan's instruction.

82.     Quam relayed Griswold's concerns with the proposed reclassification to Monaghan. However, Monaghan ignored Griswold's concerns and through Quam, directed that Griswold reclassify the unsubstantiated balances to goodwill.

83.     Monaghan knew or was reckless in not knowing that the $1 million of unsubstantiated assets was not properly attributable to goodwill associated with the purchase of LOC.

84.     In spite of her concerns, Griswold complied with Monaghan's instruction to reclassify approximately $1 million of unsubstantiated assets to goodwill on NCS' year-end 2001 financial statements.

85.     NCS' improper reclassification of unsubstantiated assets to goodwill caused an overstatement in Northwestern's reported net income and other line items for the fourth quarter of 2001, that was both quantitatively and qualitatively material.

## D.   Delay and Cover-Ups Regarding the Improper Revenue and Goodwill Entry in the Third Quarter of 2002

### i.   Northwestern's Internal Audit Uncovered NCS' Financial Misstatements

86.     In approximately May 2002, Northwestern decided to transfer NCS from NSG to its telecommunications subsidiary, Expanets. As personnel from Expanets began their due diligence of NCS, they noted what appeared to be numerous financial misstatements, including the misstatements of revenue and net income and the improper goodwill entry described above.

87.     Northwestern then dispatched internal auditors to perform a financial audit at NCS and determine the proper valuation of NCS for purposes of the transfer. Two internal auditors spent approximately two weeks on-site performing fieldwork at NCS beginning in late July 2002.

88.     Among other things, the internal auditors compared each job recorded as purportedly "in progress" on NCS' financial statements with estimates provided by Beachler as to the actual status of these jobs to estimate the amount of revenue and income NCS had improperly recognized as of June 30, 2002.

89.     During their fieldwork, the internal auditors became alarmed at what they considered to be fraudulent accounting practices at NCS. Therefore, one of the internal auditors confronted Griswold with his concerns regarding, among other things, NCS' percentage-of-completion revenue recognition practices and the goodwill entry described above.

90.     After the confrontation, Griswold then separately telephoned Thielbar and Monaghan and secretly tape-recorded their conversations to create evidence that she had acted upon their instructions regarding the percentage-of-completion revenue recognition and goodwill misstatements, respectively.

91.     In Griswold's conversation with Thielbar regarding revenue recognition, Thielbar said, among other things, "[T]he original intent [with respect to revenue recognition] was to book the work in progress. You know, if we had ordered the equipment, we should recognize the equipment. You know, that kind of stuff, but then we started getting carried away, we did a self adjustment probably too little too late, and not as thorough as frankly we should have . . ." Thielbar continued "If [the internal

auditors] went to the SEC on that, I would just be laughing . . . it would be political suicide for them to do that . . ."

92.     In early August, 2002, the internal auditors issued their draft report, and invited NCS management to prepare written responses to the items in their report.

93.     The final internal audit report identified numerous accounting improprieties at NCS, recommended a number of adjusting entries to correct the improper accounting (including the revenue and goodwill misstatements detailed above), and recommended an overhaul of NCS' internal controls.

94.     All of the accounting misstatements identified by the internal auditors had inflated NCS' financial performance.

95.     Because the accounting problems at NCS were so pervasive, and because the misstatements *all* had the effect of inflating NCS' income, they are highly probative of each of the Defendants' scienter regarding the revenue and goodwill misstatements.

96.     Further, both Beachler and Griswold told the internal auditors that the misstatements at NCS resulted from directives by management to meet projected numbers by "whatever means necessary."

### ii.     Management's Response to the Audit Report Misled Northwestern's Outside Auditors and the Audit Committee of Northwestern's Board of Directors

97.     After receiving the draft internal audit report in early August 2002, Monaghan and Thielbar eventually prepared responses to each of the internal auditors' findings.

98.     Monaghan and Thielbar delayed providing those responses to the internal auditors for over two and one-half months, causing the final audit report to be delayed

until the end of October, after Northwestern's registration of more than $800 million in securities offerings to the public.

99.     In their management responses, Monaghan and Thielbar delayed admitting to the impropriety of the revenue and goodwill misstatements by claiming that further research was required.

100.     During the third quarter of 2002, Griswold completed another analysis of each of the jobs recorded as purportedly in progress at NCS' and compared those amounts to the actual percentage–of–completion based on her calculation of labor costs incurred.  Griswold also attempted to locate initial contracts, invoices and any other form of documentation for each of the jobs.

101.     Griswold's analysis confirmed that NCS' practice of initially recognizing large percentages of anticipated revenue and costs, often before obtaining a commitment from the potential customer, had resulted in the recognition of approximately $1.3 million of revenue for jobs that had never materialized, and the premature recognition of a total of approximately $1.9 million of revenue for work on other jobs that still had not been performed as of June 30, 2002.

102.     Monaghan and Thielbar then prepared a report for the CEO of NSG, the audit committee of Northwestern's board of directors, and Northwestern's outside auditors, Deloitte & Touche LLC ("Deloitte"), to address the revenue and goodwill issues.

103.     The report prepared by Thielbar and Monaghan misrepresented both the nature and extent of the accounting problems at NCS.  For example, as to the revenue misstatements, the report obscured NCS' actual practices, describing the $1.3 million in

revenue recognition on non-existent jobs as having been "prematurely recorded" due to miscommunications "causing the accounting department to prepare customer bills that were not reflective of actual activities."

104.    Both Thielbar and Monaghan knew that this revenue was not "premature" but instead nonexistent.  Moreover, Thielbar and Monaghan also knew that no invoices had ever been generated on these non-existent jobs, and thus errant invoices did not cause this problem.

105.    The report prepared by Thielbar and Monaghan also falsely asserted that only about $130,000 of the $1 million goodwill entry needed to be written off.

106.    Because of Thielbar and Monaghan's delay and misrepresentations, Northwestern's audit committee and Deloitte did not recommend any adjustments to Northwestern's third quarter financial statements, filed on November 14, 2002, nor did Northwestern conduct an investigation to determine who was responsible for recording revenue on non-existent jobs.

107.    However, despite the disingenuous explanations and recommendations by Monaghan and Thielbar, Northwestern did in fact make all of the adjustments proposed by the internal auditors, including adjustments to correct the revenue and goodwill misstatements.

108.    Monaghan's and Thielbar's delay and misrepresentations about the accounting misstatements at NCS extended their fraudulent scheme at NCS into the third quarter of 2002.

109.    In early 2003, the internal auditors received unfavorable performance evaluations which they appealed, reporting to Northwestern management their belief that they were being retaliated against for having uncovered fraud at NCS.

110.    This report of retaliation triggered an internal investigation conducted by Northwestern's general counsel and its vice president of human resources.  The report from the internal investigation recommended that Northwestern consider corrective action against Monaghan, Quam, Thielbar and Beachler.

## FIRST CLAIM FOR RELIEF

### (Fraud – Violations by Thielbar, Beachler and Monaghan of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)])

111.    Paragraphs 1 through 110 are hereby realleged and incorporated by reference.

112.    Defendants Thielbar, Beachler and Monaghan, directly and indirectly, with scienter, in the offer or sale of Northwestern securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have employed a device, scheme, or artifice to defraud.

113.    As to Defendants Thielbar and Beachler, the violations occurred in Northwestern's:

(a)  Form S-4 filed April 24, 2002, Form S-4/Amendment #1 filed July 12, 2002, Form S-4/Amendment #2 filed August 16, 2002, Form S-4/Amendment #3 filed September 9, 2002, each of which incorporated by reference Northwestern's 2001 Form 10-K; the supplemental prospectuses filed September 30, 2002 and October 3, 2002, each of which contained the fourth quarter 2001 income statement;

(b)  Form S-4/Amendment #1 filed July 12, 2002, Form S-4/Amendment #2 filed August 16, 2002, Form S-4/Amendment #3 filed September 9, 2002, each of which incorporated by reference Northwestern's Form 10-Q for the period ended March 31, 2002; and

(c)  Form S-4/Amendment #2 filed August 16, 2002, Form S-4/Amendment #3 filed September 9, 2002, each of which incorporated by reference Northwestern's Form 10-Q for the period ended June 30, 2002; the supplemental prospectuses filed September 30, 2002 and October 3, 2002, each of which contained income statements for the period ended June 30, 2002.

114.    Paragraphs 29-67 and 86-110 state why the public filings listed in paragraph 113 were materially false and misleading.

115.    Defendants Thielbar and Beachler violated Section 17(a)(1) because, among other things, they instructed that the improper revenue be recorded on NCS' books during the fourth quarter of 2001 and the first half of 2002, and either knew or were reckless in not knowing that such instructions were improper; and, as to Thielbar, ignored warnings that the revenue recognition instructions were improper, refused to reverse unearned revenue included in NCS' financial statements, continued to provide improper revenue recognition instructions even after being notified of the impropriety, and then attempted to hide his fraudulent scheme from the external auditors and the audit committee of Northwestern's board of directors after it was uncovered by internal auditors.  Moreover, Thielbar, as head of NCS with final review and approval authority over NCS' financial statements, either knew or was reckless in not knowing that his division was recording large amounts of revenue on non-existent contracts and recording large amounts of revenue before it had been earned.

116.    Defendants Thielbar and Beachler knew or were reckless in not knowing that NCS' false financial statements, consolidated in Northwestern's 2001 10-K, and the Forms 10-Q for the periods ended March 31, 2002 and June 30, 2002, were incorporated by reference into the Forms S-4 and supplemental prospectuses referred to above.

117.    As to Defendant Monaghan, the violations occurred in Northwestern's Form S-4 April 24, 2002, Form S-4/Amendment #1 filed July 12, 2002, Form S-4/Amendment #2 filed August 16, 2002, Form S-4/Amendment #3 filed September 9, 2002, each of which incorporated by reference Northwestern's 2001 Form 10-K; and the supplemental prospectuses filed September 30, 2002 and October 3, 2002, each of which contained the fourth quarter 2001 income statement.

118.    Paragraphs 68-110 state why the public filings listed in paragraph 117 were materially false and misleading.

119.    Defendant Monaghan violated Section 17(a)(1) because, among other things, he instructed that the improper $1 million goodwill entry be made at year-end 2001 to avoid a charge against income, and either knew or was reckless in not knowing that such instruction was improper.

**120.    Defendant Monaghan knew or was reckless in not knowing that NCS' false financial statements, consolidated in Northwestern's 2001 10-K, were incorporated by reference into the Forms S-4 and supplemental prospectuses referred to above.**

121.    By reason of the foregoing, Defendants Thielbar, Beachler and Monaghan violated, and unless restrained and enjoined, violate Section 17(a)(1) of the Securities Act.

## SECOND CLAIM FOR RELIEF

### (Fraud – Violations by Thielbar, Beachler and Monaghan of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)])

122.    Paragraphs 1 through 121 are hereby realleged and incorporated by reference.

123.    Defendants Thielbar, Beachler and Monaghan, directly and indirectly, with scienter, in the offer or sale of Northwestern securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in transactions, practices, or courses of business which have been or are operating as a fraud or deceit upon the purchasers of Northwestern securities.

124.    As to Defendants Thielbar and Beachler, the violations occurred in Northwestern's:

(a) Form S-4 April 24, 2002, Form S-4/Amendment #1 filed July 12, 2002, Form S-4/Amendment #2 filed August 16, 2002, Form S-4/Amendment #3 filed September 9, 2002, each of which incorporated by reference Northwestern's 2001 Form 10-K; the supplemental prospectuses filed September 30, 2002 and October 3, 2002, each of which contained the fourth quarter 2001 income statement;

(b) Form S-4/Amendment #1 filed July 12, 2002, Form S-4/Amendment #2 filed August 16, 2002, Form S-4/Amendment #3 filed September 9, 2002, each of which incorporated by reference Northwestern's Form 10-Q for the period ended March 31, 2002; and

(c) Form S-4/Amendment #2 filed August 16, 2002, Form S-4/Amendment #3 filed September 9, 2002, each of which incorporated by reference Northwestern's Form 10-Q for the period ended June 30, 2002; the supplemental prospectuses filed September 30, 2002 and October 3, 2002, each of which contained income statements for the period ended June 30, 2002.

125.    Paragraphs 29-67 and 86-110 state why the public filings listed in paragraph 124 were materially false and misleading.

126.    Defendants Thielbar and Beachler violated Section 17(a)(2) and (3) because, among other things, they instructed that the improper revenue be recorded on NCS' books during the fourth quarter of 2001 and the first half of 2002, and either knew or should have known that such instructions were improper; and, as to Thielbar, ignored warnings that the revenue recognition instructions were improper, refused to reverse unearned revenue included in NCS' financial statements, continued to provide improper revenue recognition instructions even after being notified of the impropriety, and then attempted to hide his fraudulent scheme from the external auditors and the audit committee of Northwestern's board of directors after it was uncovered by internal auditors.  Moreover, Thielbar, as head of NCS with final review and approval authority

over NCS' financial statements, either knew or should have known that his division was recording large amounts of revenue on non-existent contracts and recording large amounts of revenue before it had been earned.

127.    As to Defendant Monaghan, the violations occurred in Northwestern's Form S-4 April 24, 2002, Form S-4/Amendment #1 filed July 12, 2002, Form S-4/Amendment #2 filed August 16, 2002, Form S-4/Amendment #3 filed September 9, 2002, each of which incorporated by reference Northwestern's 2001 Form 10-K; and the supplemental prospectuses filed September 30, 2002 and October 3, 2002, each of which contained the fourth quarter 2001 income statement.

128.    Paragraphs 68-110 state why the public filings listed in paragraph 127 were materially false and misleading.

129.    Defendant Monaghan violated Section 17(a)(2) and (3) because, among other things, he instructed that the improper $1 million goodwill entry be made at year-end 2001 to avoid a charge against income, and either knew or should have known that such instruction was improper.

130.    By reason of the foregoing, Defendants Thielbar, Beachler and Monaghan violated, and unless restrained and enjoined, will violate Section 17(a)(2) and (3) of the Securities Act.

## THIRD CLAIM FOR RELIEF

### (Fraud – Violations by Thielbar, Beachler and Monaghan of Section 10(b) of the Exchange Act and Rule 10(b)(5) thereunder [15 U.S.C. §§ 78j(b) and §240.10b-5])

131.    Paragraphs 1 through 130 are hereby realleged and incorporated by reference.

132.    Defendants Thielbar, Beachler and Monaghan directly and indirectly, with scienter, in connection with the purchase or sale of Northwestern securities, by use of the means or instrumentalities of interstate commerce or by use of the mails, employed devices, schemes, or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or have engaged in acts, practices, or courses of business which have been and are operating as a fraud or deceit upon the purchasers or sellers of such securities.

133.    As to Defendants Thielbar and Beachler, the violations occurred in connection with Northwestern's:

(a)  Form 10-K for the period ended December 31, 2001 filed April 1, 2002, and Amendment #2 to the Form 10-K for the period ended December 31, 2001, filed September 20, 2002; Form 8-K filed February 7, 2002, Form 8-K filed March 4, 2002, Form 8-K filed September 20, 2002, Amended Form 8-K filed September 24, 2002, each of which contained income statements for fourth quarter 2001;

(b)  Form 10-Q for the period ended March 31, 2002, and Amendment #1 to Form 10-Q for the period ended March 31, 2002; Form 8-K filed May 1, 2002 which contained income statements for the period ended March 31, 2002; and

(c)  Form 10-Q for the period ended June 30, 2002, and Amendment #1 to Form 10-Q for the period ended June 30, 2002; Form 8-K filed August 8, 2002, Form 8-K filed September 20, 2002, Amended Form 8-K filed September 24, 2002 each of which contained income statements for the period ended June 30, 2002.

134.    Paragraphs 29-67 and 86-110 state why the public filings listed in paragraph 133 were materially false and misleading.

135.    Defendants Thielbar and Beachler violated Section 10(b) and Rule 10b-5 thereunder because, among other things, they instructed that the improper revenue be recorded on NCS' financial statements during the fourth quarter of 2001 and the first half of 2002, and either knew or were reckless in not knowing that such instructions were improper; and, as to Thielbar, ignored warnings that the revenue recognition instructions were improper, refused to reverse unearned revenue included in NCS' financial statements, continued to provide improper revenue recognition instructions even after being notified of the impropriety, and then attempted to hide his fraudulent scheme from the external auditors and the audit committee of Northwestern's board of directors after it was uncovered by internal auditors. Moreover, Thielbar, as head of NCS with final review and approval authority over NCS' financial statements, either knew or was reckless in not knowing that his division was recording large amounts of revenue on non-existent contracts and recording large amounts of revenue before it had been earned.

136.    As to Defendant Monaghan, the violations occurred in connection with Northwestern's Form 10-K for the period ended December 31, 2001 filed April 1, 2002, and Amendment #2 to the Form 10-K for the period ended December 31, 2001, filed September 20, 2002; Form 8-K filed February 7, 2002, Form 8-K filed March 4, 2002, Form 8-K filed September 20, 2002, Amended Form 8-K filed September 24, 2002, each of which contained income statements for fourth quarter 2001.

137.    Paragraphs 68-110 state why the public filings listed in paragraph 136 were materially false and misleading.

138.    Defendant Monaghan violated Section 10(b) and Rule 10b-5 thereunder because, among other things, he instructed that the improper $1 million goodwill entry be made at year-end 2001 to avoid a charge against income, and either knew or was reckless in not knowing that such instruction was improper.

139.    By reason of the foregoing, Defendants Thielbar, Beachler and Monaghan violated, and unless restrained and enjoined, will violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## FOURTH CLAIM FOR RELIEF

### (Falsified Books and Records -- Violations By Thielbar, Beachler, Monaghan, Quam and Griswold of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1])

140.    Paragraphs 1 through 139 are hereby realleged and incorporated by reference.

141.    Defendants Thielbar, Beachler, Monaghan, Quam and Griswold knowingly circumvented or knowingly failed to implement a system of internal accounting controls, knowingly falsified books, records, or accounts and directly or indirectly falsified or caused to be falsified books, records or accounts described in Section 13(b)(2) of the Exchange Act.

142.    The violations occurred because NCS did not implement an adequate system of internal accounting controls as stated in paragraphs 29-110 and NCS' books, records, and accounts were knowingly falsified as stated in paragraphs 29-110.

143.    Defendants Thielbar, Beachler, Monaghan, Quam and Griswold violated Section 13(b)(5) because they knowingly circumvented a system of internal accounting controls, knowingly failed to implement a system of internal accounting controls, or knowingly falsified NCS' books, records, and accounts.

144.    By reason of the foregoing, Defendants Thielbar, Beachler, Monaghan, Quam and Griswold violated, and unless restrained and enjoined, will violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## FIFTH CLAIM FOR RELIEF

### (Fraud -- Aiding and Abetting by Thielbar of Northwestern's Violations of Section 10(b) of the Exchange Act and Rule 10(b)(5) thereunder [15 U.S.C. §§ 78j(b) and §240.10b-5])

145.    Paragraphs 1 through 144 are hereby realleged and incorporated by reference.

146.    Northwestern, an issuer of a security registered pursuant to Section 12(b) of the Exchange Act, directly and indirectly, with scienter, in connection with the purchase or sale of Northwestern securities, by use of the means or instrumentalities of interstate commerce or by use of the mails, employed devices, schemes, or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or have engaged in acts, practices, or courses of business which have been and are operating as a fraud or deceit upon the purchasers or sellers of such securities.

147.    The violations occurred in connection with the following public statements, namely Northwestern's:

(a)  Form 10-K for the period ended December 31, 2001 filed April 1, 2002, and Amendment #2 to the Form 10-K for the period ended December 31, 2001, filed September 20, 2002; Form 8-K filed February 7, 2002, Form 8-K filed March 4, 2002, Form 8-K filed September 20, 2002, Amended Form 8-K filed September 24, 2002, each of which contained income statements for fourth quarter 2001;

(b)  Form 10-Q for the period ended March 31, 2002, and Amendment #1 to Form 10-Q for the period ended March 31, 2002; Form 8-K filed May 1, 2002 which contained income statements for the period ended March 31, 2002; and

(c)  Form 10-Q for the period ended June 30, 2002, and Amendment #1 to Form 10-Q for the period ended June 30, 2002; Form 8-K filed August 8, 2002, Form 8-K filed

September 20, 2002, Amended Form 8-K filed September 24, 2002 each of which contained income statements for the period ended June 30, 2002.

148.    Paragraphs 29-67 and 86-110 state why the public filings listed in paragraph 147 were materially false and misleading.

149.    Thielbar knew, or was severely reckless in not knowing, of Northwestern's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and substantially assisted Northwestern in committing these violations, by among other things, ignoring warnings that the revenue recognition instructions were improper, refusing to reverse unearned revenue included in NCS' financial statements, continuing to provide improper revenue recognition instructions even after being notified of the impropriety, and then attempting to hide his fraudulent scheme from the external auditors and the audit committee of Northwestern's board of directors after it was uncovered by internal auditors.  Moreover, Thielbar, as head of NCS with final review and approval authority over NCS' financial statements, either knew or was reckless in not knowing that his division was recording large amounts of revenue on non-existent contracts and recording large amounts of revenue before it had been earned

150.    By reason of the foregoing, Thielbar aided and abetted Northwestern's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

## SIXTH CLAIM FOR RELIEF

**(False SEC Filings -- Aiding and Abetting by Thielbar, Beachler, Monaghan, Quam and Griswold of Northwestern's Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20,  13a-1 and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-11])**

151.    Paragraphs 1 through 150 are hereby realleged and incorporated by reference.

152.   Northwestern, an issuer of a security registered pursuant to Section 12(b) of the Exchange Act, filed materially misleading annual and current reports with the Commission.

153.   By reason of the foregoing, Northwestern violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-11].

154.   As to Defendants Thielbar, Beachler and Griswold, the violations occurred in connection with Northwestern's:

(a)   Form 10-K for the period ended December 31, 2001 filed April 1, 2002, and Amendment #2 to the Form 10-K for the period ended December 31, 2001, filed September 20, 2002; Form 8-K filed February 7, 2002, Form 8-K filed March 4, 2002, Form 8-K filed September 20, 2002, Amended Form 8-K filed September 24, 2002, each of which contained income statements for fourth quarter 2001;

(b)   Form 8-K filed May 1, 2002 which contained income statements for the period ended March 31, 2002; and

(c)   Form 8-K filed August 8, 2002, Form 8-K filed September 20, 2002, Amended Form 8-K filed September 24, 2002, each of which contained income statements for the period ended June 30, 2002.

155.   Thielbar and Beachler knew of Northwestern's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-11 thereunder and substantially assisted Northwestern in committing these violations, by among other things, instructing that the improper revenue be recorded on NCS' books during the fourth quarter of 2001 and the first half of 2002; and, as to Thielbar, ignored warnings that the revenue recognition instructions were improper, refused to reverse unearned revenue included in NCS' financial statements, continued to provide improper revenue recognition instructions even after being notified of the impropriety, and then attempted to hide his fraudulent scheme from the external auditors and the audit committee of Northwestern's board of directors after it was uncovered by internal auditors. Moreover, Thielbar, as

head of NCS with final review and approval authority over NCS' financial statements, either knew or was reckless in not knowing that his division was recording large amounts of revenue on non-existent contracts and recording large amounts of revenue before it had been earned.

156.   Griswold knew of Northwestern's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-11 thereunder and substantially assisted Northwestern in committing these violations, by among other things, recording the improper revenue entries on NCS' books.

157.   As to Defendants Monaghan, Quam and Griswold, the violations occurred in connection with the following public statements, Northwestern's:  Form 10-K for the period ended December 31, 2001 filed April 1, 2002, and Amendment #2 to the Form 10-K for the period ended December 31, 2001, filed September 20, 2002; Form 8-K filed February 7, 2002, Form 8-K filed March 4, 2002, Form 8-K filed September 20, 2002, Amended Form 8-K filed September 24, 2002, each of which contained income statements for fourth quarter 2001.

158.   Monaghan and Quam knew of Northwestern's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-11 thereunder and substantially assisted Northwestern in committing these violations, by among other things, instructing Griswold to record the improper $1 million goodwill entry at year-end 2001 to avoid a charge against income.

159.   Griswold knew of Northwestern's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-11 thereunder and substantially assisted Northwestern in committing these violations, by among other things, recording the improper $1 million goodwill entry at year-end 2001 to avoid a charge against income.

160.   By reason of the foregoing, Thielbar, Beachler, Monaghan, Quam and Griswold aided and abetted Northwestern's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-11 thereunder, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

## SEVENTH CLAIM FOR RELIEF

### (False SEC Filings -- Aiding and Abetting by Thielbar, Beachler and Griswold of Northwestern's Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-13 thereunder [17 C.F.R. § 240.13a-13])

161.    Paragraphs 1 through 160 are hereby realleged and incorporated by reference.

162.    Northwestern, an issuer of a security registered pursuant to Section 12(b) of the Exchange Act, filed materially misleading quarterly reports with the Commission.

163.    The violations occurred in connection with the following public statements, namely Northwestern's:  Forms 10-Q for the periods ended March 31, 2002, June 30, 2002 and September 30, 2002 and Amended 2002 Forms 10-Q filed on September 20, 2002.

164.    By reason of the foregoing, Northwestern violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-13 thereunder [17 C.F.R. § 240.13a-13].

165.    Thielbar and Beachler knew of Northwestern's violations of Section 13(a) of the Exchange Act and Rule 13a-13 thereunder and substantially assisted Northwestern in committing these violations, by among other things, instructing that the improper revenue be recorded on NCS' books during the first half of 2002; and, as to Thielbar, ignored warnings that the revenue recognition instructions were improper, refused to reverse unearned revenue included in NCS' financial statements, continued to provide improper revenue recognition instructions even after being notified of the impropriety, and then attempted to hide his fraudulent scheme from the external auditors and the audit committee of Northwestern's board of directors after it was uncovered by internal auditors.  Moreover, Thielbar, as head of NCS with final review and approval authority over NCS' financial statements, either knew or was reckless in not knowing that his

division was recording large amounts of revenue on non-existent contracts and recording large amounts of revenue before it had been earned.

166.    Griswold knew of Northwestern's violations of Section 13(a) of the Exchange Act and Rule 13a-13 thereunder and substantially assisted Northwestern in committing these violations, by among other things, recording unearned revenue on NCS' books during the first half of 2002.

167.    By reason of the foregoing, Thielbar, Beachler and Griswold aided and abetted Northwestern's violations of Section 13(a) of the Exchange Act and Rule 13a-13 thereunder, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

## EIGHTH CLAIM FOR RELIEF

### (False Books and Records -- Aiding and Abetting by Thielbar, Beachler, Monaghan, Quam and Griswold of Northwestern's Violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)])

168.    Paragraphs 1 through 167 are hereby realleged and incorporated by reference.

169.    Northwestern failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets.

170.    By reason of the foregoing, Northwestern violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

171.    Thielbar, Beachler, Monaghan, Quam and Griswold knew of Northwestern's violations of Section 13(b)(2)(A) of the Exchange Act and substantially assisted Northwestern in committing these violations.

172.    The violations occurred because NCS failed to make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets as stated in paragraphs 29-110.

173.   Defendants Thielbar, Beachler, Monaghan, Quam and Griswold aided and abetted violations of Section 13(b)(2)(A):  because (i) they knew that NCS failed to make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets; and (ii) they provided substantial assistance by failing to take prompt and effective action to correct the company's failure.

174.   By reason of the foregoing, Thielbar, Beachler, Monaghan, Quam and Griswold aided and abetted Northwestern's violations of Section 13(b)(2)(A) of the Exchange Act, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

## NINTH CLAIM FOR RELIEF

### (Internal Accounting Controls Violations -- Aiding and Abetting by Thielbar, Beachler, Monaghan, Quam and Griswold of Northwestern's Violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)])

175.   Paragraphs 1 through 174 are hereby realleged and incorporated by reference.

176.   Northwestern failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements and to maintain accountability for assets, and that the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

177.   By reason of the foregoing, Northwestern violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

178.   Thielbar, Beachler, Monaghan, Quam and Griswold knew of Northwestern's violations of Section 13(b)(2)(B) of the Exchange Act and substantially assisted Northwestern in committing these violations.

179.    The violations occurred because NCS, an operating division of Northwestern, failed devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements and to maintain accountability for assets, and that the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences as stated in paragraphs 29-110.

180.    Defendants Thielbar, Beachler, Monaghan, Quam and Griswold aided and abetted violations of Section 13(b)(2)(B) because: (i) they knew that NCS failed devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain accountability for assets, and that the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences; and (ii) they provided substantial assistance in that they failed to take prompt and effective action to correct the failure of the company to maintain an appropriate system of internal controls.

181.    By reason of the foregoing, Thielbar, Beachler, Monaghan, Quam and Griswold aided and abetted Northwestern's violations of Section 13(b)(2)(B) of the Exchange Act, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

## I.

Find that the Defendants, and each of them, committed the violations alleged.

## II.

Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each defendant from violating, directly or indirectly, the provisions of law and rules alleged in this complaint.

## III.

Order Defendant Thielbar to disgorge all ill-gotten gains received or benefits in any form derived from the illegal conduct alleged in this Complaint, together with pre-judgment and post-judgment interest as provided by law.

## IV.

Order requiring Thielbar to pay third tier civil penalties and requiring Monaghan to pay a $25,000 civil penalty, and Griswold to pay a $10,000 civil penalty, pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §§ 77t(d) and 78u(d)(3)].

## V.

Order pursuant to Exchange Act Section 21(d)(2), as amended by Section 305 of the Sarbanes-Oxley Act. [15 U.S.C. 78u(d)(2)], or pursuant to the equitable authority of the court, that Defendant Thielbar be permanently barred from serving as an officer or director of any public company.

## VI.

Grant such other relief as this Court may deem just or appropriate.

## JURY DEMAND

Plaintiff demands a jury trial in this matter.

Dated: _1 Dec 06_

Respectfully submitted,

ELIZABETH E. KRUPA
ALLISON HERREN LEE
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO 80202
Phone: (303) 844-1000
Fax: (303) 844-1068