

FILED
SEP 28 2007

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | \* | CIV 06-4253 |
| Plaintiff, | \* | |
| vs. | \* | |
| BART THIELBAR; DAVID A. MONAGHAN; KEITH W. BEACHLER; JANA L. QUAN, and CARY B. GRISWOLD, | \* | MEMORANDUM OPINION AND ORDER |
| Defendants. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending before the Court is Defendant Bart Thielbar's Motion to Dismiss, Doc. 26. The motion has been fully briefed and will be decided based upon the written record. The other Defendants in this action, David Monaghan, Keith Beachler, Jana Quan and Cary Griswold, consented to the entry of final judgments without admitting or denying the allegations of the Complaint (except as to jurisdiction), waived findings of fact and conclusions of law, and waived any right to appeal from the final judgments. Final Judgments were entered against these four Defendants on December 14, 2006 (Docs. 7, 8, 9 and 10.) Defendant Thielbar thereafter filed the pending motion. For the reasons set forth below, the Motion to Dismiss will be granted in part and denied in part.

## BACKGROUND

The Securities and Exchange Commission ("SEC") brings this action pursuant to Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d) and (e). Based upon the conduct alleged in the Complaint, the SEC seeks an order permanently restraining and enjoining Thielbar from serving as an officer or director of any public company, an order

requiring Thielbar to disgorge all ill-gotten gains from his fraudulent conduct, including his salary, bonuses, stock and other compensation from NorthWestern Corporation, and an order requiring Thielbar to pay third-tier civil penalties pursuant to the Exchange Act. The allegations in the Complaint are taken as true for purposes of deciding the Motion to Dismiss.

From April 2000 until June 2002, Thielbar was employed as the chief executive officer of NorthWestern Communications Solutions ("NCS"), an operating division of NorthWestern Services Group, Inc. ("NSG"), a wholly owned subsidiary of NorthWestern Corporation ("NorthWestern"), from April 2000 until June 2002. In April 2000, Thielbar was appointed Vice President of Norcom Advanced Technologies, Inc. ("Norcom"), a wholly owned subsidiary of NorthWestern that was included in the NCS operating division. In April 2001, Thielbar was also appointed Vice President of NSG. Thielbar's bonuses were based, in part, on NCS's financial results.

NCS recognized approximately $3.2 million of unearned revenue during the fourth quarter of 2001 and the first two quarters of 2002 and improperly reclassified $1 million of unsubstantiated assets to a goodwill account at the close of 2001 to avoid a year-end charge against income. During this time, NCS improperly recognized revenue through the intentional misuse of the percentage-of-completion accounting method for transactions at NCS in two ways: (1) estimated revenue from potential sales leads was improperly recorded as "work in progress" before a prospective customer had even agreed to the transaction; and (b) estimated revenue was improperly recorded on transactions (or "jobs") in percentage amounts far exceeding the actual percentage of completion of the work on the job. Thielbar and Defendant Keith Beachler instructed Defendant Cary Griswold to make the fraudulent revenue entries. Griswold was the primary staff accountant for NCS from April 2001 until August 2003. This fraudulent accounting at NCS caused NorthWestern to materially misstate its income during the fourth quarter of 2001 and the first and second quarters of 2002 in its public filings because NCS's financial information was incorporated into NorthWestern's publicly filed financial statements. NorthWestern's financial statements for year-end 2001 and the first two quarters of 2002 were particularly important since they represented the most recent financial information published before NorthWestern's registration of more than $800 million in securities

offerings in the fall of 2002 at a time when the company was publicly struggling with its liquidity and cash flow.

Although Thielbar is not an accountant, he required Griswold to submit NCS' financial statements to him for review and approval each month before sending them to NSG. After Thielbar approved NCS's financial statements, they were consolidated into NSG's financial statements, and in turn NSG's financial statements were consolidated into NorthWestern's publicly filed financial statements. The financial fraud described above was discovered by NorthWestern in an internal audit in the third quarter of 2002 after deciding to transfer NCS from NSG to NorthWestern's telecommunications subsidiary.

NCS began recognizing revenue based upon a purported percentage-of-completion accounting method in late 2000 on a few jobs. By early 2001, Thielbar and Beachler began instructing the former NCS controller to recognize revenue using this method for an increasing number of jobs. Griswold's predecessor, referred to herein as "the former NCS controller", was uncomfortable with this accounting method and resigned in April 2001. Griswold then became the primary NCS accountant. When Griswold became the accountant, Thielbar increased his use of percentage-of-completion revenue recognition. Thielbar demanded that NCS sales staff provide him with information on any additional sales they had closed or anticipated closing, which were not included in Griswold's proposed financial statements. Thielbar would then use this information to instruct Griswold to record additional estimated revenue on these additional jobs before submitting NCS's financial statements to NSG. Griswold often immediately recorded 100% of the estimated revenue and costs for these additional jobs, allowing NCS to recognize its entire profit from a job before performing any work.

By late 2001, Griswold knew that Thielbar's instructions to record the additional revenues described above were not accurate. In late 2001, Griswold attempted to obtain more documentation for the revenue she was being instructed by Thielbar to record. But she continued to record the revenue as instructed by Thielbar without first obtaining proper documentation.

3

In February or March 2002, Griswold confronted Thielbar with the fact that NCS has recorded more revenue than NCS had actually earned by misuse of percentage-of-completion revenue recognition. Despite Griswold' warning, Thielbar refused to authorize accounting entries to correct the unearned revenue entries and continued to require Griswold to improperly record revenue with the percentage-of-completion accounting method. From the end of March 2002 through the end of June 2002, when Thielbar was transferred out of NCS, NCS recognized revenue for 41 additional jobs using the percentage-of-completion accounting method. Revenue for 36 of these jobs later had to be reversed in whole or in part.

By June 30, 2002, NCS had recognized revenue for more than 60 jobs using the percentage-of-completion accounting method and the accumulated revenue associated with those jobs had grown from $3 million to $4.2 million. After the internal audit, NorthWestern determined that $3.2 million of the $4.2 million in revenue was improperly recorded because it was based upon jobs that never actually occurred or on work that had not yet been performed. In part due to Thielbar's delay and misrepresentations regarding the improperly recorded revenue, the adjustments to NCS's financial statements did not occur until after NorthWestern issued $800 million in securities offerings in the fall of 2002.

Based upon the above conduct, the SEC brought nine causes of action against Thielbar under various sections of the Exchange Act and the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77v(a). Thielbar seeks to have the SEC's Complaint dismissed. One of Thielbar's primary arguments is that even if $3.2 million of improper or premature revenue was included in NCS's financial statements and then incorporated into NorthWestern's financial statements, that was not a material false or misleading fact that is actionable under the securities laws because that amount represents less than .19% of NorthWestern's revenues during the relevant time period. Materiality is an element of the First, Second, Third, Fifth, Sixth and Seventh Claims in the Complaint.

Thielbar also contends the Eighth Circuit's recent ruling in *In re Charter Communications, Inc.*, 443 F.3d 987, 990-92 (8th Cir. 2006) is dispositive of his motion. His argument is that the SEC

has not alleged, nor could it, that he prepared, reviewed, or issued any of NorthWestern's allegedly false financial statements, or that he made any other false or misleading statements to investors. Accordingly, Thielbar requests that the Court dismiss the fraud claims for failure to allege he made or caused to be made a false statement to investors.

Another argument advanced by Thielbar is that the Complaint does not allege a factual basis for believing the SEC can prove scienter. Scienter is an element of the First, Second, Third and Fifth Claims. The Complaint contains allegations that Thielbar "should have known" some revenue was improperly recorded, which is a negligence standard. Thielbar also alleges the Complaint does not contain particularized allegations of fraud as required by Rule 9(b). Names of customers, terms of specific transactions, dates and approximate amounts are all required, argues Thielbar, to allege fraud with particularity. He contends the SEC does not identify the location of the alleged misstatements in the 1835 pages of 18 different SEC filings referenced in the Complaint.

The Second Claim in the Complaint alleges violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act. 15 U.S.C. § 77q(a)(2) and (3). Thielbar states that proof of negligence is sufficient to establish liability under these sections. But Thielbar argues he is not one of the persons subject to liability under Section 17(a) because it only applies to "any person in the offer or sale of securities," 15 U.S.C. § 77q, and the Complaint does not allege Thielbar had any involvement in the securities offerings that underlie the Section 17(a) claims.

The Fourth Claim in the Complaint alleges Thielbar violated Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1 promulgated thereunder, 17 C.F.R. § 240.13b2-1, which prohibits any person from knowingly circumventing or failing to implement a system of internal accounting controls or knowingly falsifying any book, record or account. Thielbar contends the Fourth Claim contains multiple allegations against multiple defendants and leaves him unable to identify what, in particular, he is alleged to have done to violate Section 13(b)(5).

The Fifth through Ninth Claims in the Complaint allege Thielbar is liable for aiding and abetting NorthWestern's securities laws violations. Thielbar contends the SEC can prevail only if it shows the alleged aider and abetter had actual knowledge of the primary unlawful conduct.

## DISCUSSION

In ruling on a motion to dismiss under Rule 12(b)(6), the Court will assume the facts pleaded in the Complaint are true and will construe those facts in the light most favorable to the plaintiff. *See Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829 (8th Cir. 2003). "[A]s a practical matter, dismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Id.* (quotation marks and citations omitted).

As to the allegations of fraud, Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." FED.R.CIV.P. 9(b). The Eighth Circuit has also recognized that, "[t]he requirements of Rule 9(b) must be read in conjunction with the principles of Rule 8, which calls for pleadings to be 'simple, concise, and direct, ... and to be construed as to do substantial justice.'" *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) (quoting FED.R.CIV.P. 8). "The purpose of Rule 9(b) is 'to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based ....'" *Id.* (citations omitted). "Simply stated, a complaint must 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" *Id.* (citations omitted). But "Rule 9(b) does not require that a complaint set forth detailed evidentiary matter as to why particular defendants are responsible for particular statements ...." *Id.* at 1253. Rule 9(b) does not apply, however, to the SEC's claims brought under Section 13 of the Exchange Act regarding false books and records, lack of internal controls and reporting violations, because proof of fraud or mistake is not a prerequisite to establishing liability under Section 13. *See In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314-15 (8th Cir. 1997) (holding that the particularity requirement of Rule 9(b) does not apply to claims under Section 11 of the Securities Act

6

because fraud or mistake are not elements under that section); *Romine v. Acxiom Corp.*, 296 F.3d 701, 704-05 (8th Cir. 2002) (holding that *NationsMart* remains controlling precedent in the Eighth Circuit).

1.  **Fraud Claims - First, Second, Third, Fifth, Sixth and Seventh Claims**

    The Exchange Act was enacted "in order to promote full disclosure and thereby protect investors against manipulation of stock prices." *Alpern v. Utilicorp United, Inc.*, 84 F.3d 1525, 1533 (8th Cir. 1996); 15 U.S.C. § 78j. Section 10(b) of the Exchange Act specifically prohibits the use of any "manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b).

    > Rule 10b-5, promulgated under the Exchange Act by the SEC, provides that:
    >
    > It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
    > (a) To employ any device, scheme, or artifice to defraud,
    > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
    > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
    > in connection with the purchase or sale of any security.

    17 C.F.R. § 240.10b-5. "To successfully state a securities fraud claim under Rule 10b-5, a plaintiff must show the following: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the plaintiff's injury." *Druskin v. Answerthink, Inc.*, 299 F.Supp.2d 1307, 1320 (S.D.Fla. 2004). While scienter is not explicitly mentioned in the statutory text, it is an essential element of a § 10b-5 or Rule 10b-5 claim. *See Alpern*, 84 F.3d at 1533-34.

    Section 17(a) provides that:

> It shall be unlawful for any person in the offer or sale of any securities ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> ...
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). The SEC must establish scienter to prevail on a securities fraud claim under Section 10(b) of the Exchange Act, Rule 10b-5 and Section 17(a)(1) of the Securities Act. *See Aaron v. SEC*, 446 U.S. 680, 695-97 (1980). The elements of a securities fraud claim under Section 10(b) of the Exchange Act, Rule 10b-5 and Section 17(a)(1) of the Securities Act are essentially the same.

Scienter is defined as "'the intent to deceive, manipulate, or defraud.'" *Florida State Bd. of Educ. v. Green Tree Fin. Corp.*, 270 F.3d 645, 653 (8th Cir. 2001) (quoting *In re NationsMart,*, 130 F.3d at 320). In the Eighth Circuit, recklessness satisfies the Rule 10b-5 scienter requirement. Recklessness, as defined in the Eighth Circuit, is:

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Green Tree*, 270 F.3d at 654 (quoting *Camp v. Dema*, 948 F.2d 455, 461 (8th Cir. 1991)). The Court must dismiss a complaint that does not meet the requirements for securities fraud actions set forth in § 78u-4(b)(1) & (2). See 15 U.S.C. § 78u-4(b)(3)(A).

### A.     Primary liability

Defendant contends he cannot be held liable as a primary violator of the securities laws because he did not personally prepare, review or issue any of NorthWestern's SEC filings referred to in the Complaint. Thus, he argues the First, Second and Third Claims of the Complaint should

8

be dismissed. Thielbar primarily bases this argument on the Eighth Circuit's recent ruling in *In re Charter*, 443 F.3d at 990-92. Unlike the defendants in *In re Charter*, however, Thielbar is alleged to have provided false information to NorthWestern, which he knew would be incorporated into NorthWestern's SEC filings. The defendants in *In re Charter* were third-party vendors who entered into transactions with the issuer and the issuer then improperly accounted for those transactions. 443 F.3d at 990-92. The *In re Charter* defendants did not make or cause to be made fraudulent misstatements regarding the transactions. Moreover, the issuer in *In re Charter*, unlike NorthWestern in the present case, was aware of the fraudulent nature of the transactions and improper accounting. Thielbar's actions in supplying fraudulent financial information to NCS's accountant regarding NCS's revenues, which he knew would be and were incorporated into NorthWestern's publicly filed financial statements, is sufficient to allege primary liability under Section 10(b) of the Exchange Act and Section 17(a)(1) of the Securities Act. *See Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996) (holding that "for an accountant's misrepresentation to be actionable as a primary violation, there must be a showing that he knew or should have known that his representation would be communicated to investors because § 10(b) and Rule 10b-5 focus on fraud made 'in connection with the sale or purchase' of a security.").

### B.     Materiality

"To present a cognizable claim for securities fraud, a plaintiff must allege that a defendant made misrepresentations that were material." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997). "A fact is deemed material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as substantially altering the mix of information available to the investor." *Gebhardt*, 335 F.3d at 829. "Ordinarily, materiality is a question of fact for the jury; however, we have recognized an exception in cases where the false information is so insignificant, in relation to the total mix of data available, that it would not have mattered to a reasonable investor." *Id.* (citing *Parnes*, 122 F.3d at 547); *see Parnes*, 122 F.3d at 546 (holding that "[w]here a reasonable investor could not have been swayed by an alleged misrepresentation ... a court may determine, as a matter of law, that the alleged misrepresentation is immaterial.").

9

The Complaint alleges that NCS recorded a total of $3.2 million in fraudulent revenue over a period of three quarters. The Complaint further alleges this overstatement caused a material misstatement of NorthWestern's (I) fourth quarter 2001 net income, reported in the 2001 Form 10-K as $5,091,000; (ii) first quarter 2002 net income, and income before minority interests reported in the First Quarter 2002 Form 10-Q as ($2,948,800)[1] and $9,045,000, respectively; (iii) second quarter net income, reported in the Second Quarter 2002 Form 10-Q as $15,804,000; and (iv) first half 2002 net income before extraordinary item, reported in the Second Quarter 2002 Form 10-Q as ($237,000).

Thielbar argues that rather than comparing the $3.2 million of alleged fraudulent revenue to NorthWestern's net income to determine its materiality, the $3.2 million overstatement of revenue should be compared to NorthWestern's gross revenues for the relevant three quarters, totaling $1,793,184,000. Even after the restatement of NorthWestern's financial statements on April 1, 2003, the reported revenue for the relevant three quarters was $1,748,309,000. Thus, Thielbar contends the $3.2 million of allegedly fraudulent revenue at NCS represents less than 0.19% of NorthWestern's reported revenue during the three quarters at issue ($3.2 million divided by $1,748,309,000). For the reasons set forth below, the Court agrees that the alleged overstated revenue should be compared to revenue on NorthWestern's financial statements rather than its net income.

The SEC has quantified the amount of alleged revenue overstated or prematurely recognized by NCS, but fails to allege the magnitude of those overstatements *in relation to* NorthWestern's *overall* financial picture. *See Shushany v. Allwaste, Inc.*, 992 F.2d 517, 522 (5th Cir. 1993) (affirming the dismissal of a securities fraud complaint in part because it did not allege how the improper accounting adjustments were material in light of the defendants' overall financial position);

---

[1] There is an apparent typographical error in Plaintiff's Response in Opposition to Defendant's Motion to Dismiss, Doc. 30, on page 7, where the first quarter 2002 net income is stated to be "($29,488,00)". The Court will assume the typographical error is that a zero was omitted at the end of this figure. Even if the Court's assumption is incorrect, it does not affect the ultimate decision regarding materiality in this case.

*Gavish v. Revlon*, 2004 WL 2210269 (S.D.N.Y. 2004) (holding that the complaint did not establish materiality for securities fraud claims because it did not "even attempt to approximate the magnitude or degree of ... misstatements in relation to [the parent corporation's] total financial picture."). In its brief, the SEC states what NorthWestern's *reported* net income was for the three quarters at issue, but does not quantify the amount of alleged *overstatement* of net income. The SEC's brief implies the Court should compare the alleged $3.2 million in overstated *revenue* at NCS to NorthWestern's reported *net income* to determine if the alleged overstatement is quantitatively material. But the SEC does not allege how much of the $3.2 million in overstated revenue was profit, so the Court is unable to determine what the resulting overstatement of net income is on NorthWestern's financial statements. The SEC does not explain in its brief its justification for comparing an overstatement of *revenue* with *net income*. *See Gebhardt*, 335 F.3d at 165 (recognizing that items alleged to be overstated on financial statements "should be compared to like items on the corporate financial statement.").

In *Gebhardt*, cited by the SEC, the Eighth Circuit reversed the District Court's dismissal of a complaint alleging securities fraud. 335 F.3d at 827. The district court held that the subsidiary's misrepresentations of the amount of earnings was merely 0.4% of the *parent* corporation's *total revenue* during the years in question. *See id.* at 828. But the Eighth Circuit rejected that comparison and instead looked to the allegation in the complaint that the parent corporation *overstated* its *net income* for two years by 8% in deciding if the prematurely recognized revenue was a material misstatement. *See id.* at 830. In the present case, the SEC did not include any amounts in the Complaint regarding the amount it alleges NorthWestern *overstated* its *net income* as a result of NCS's overstatement of revenue. In light of this lack of information, the Court is unable to make the materiality determination on the same basis as the Eighth Circuit did in *Gebhardt*. Thus, the Court is only able to evaluate materiality by comparing the $3.2 million of overstatement of revenue at NCS to NorthWestern's total revenues in the same time period, which is set forth below.

Defendant provided the Court with those portions of NorthWestern's publicly filed financial reports for the last quarter of 2001 and the first two quarters of 2002 that show NorthWestern's

11

revenues for these time periods.[2] The total revenue for the relevant time periods is $1,748,309,000, after the April 1, 2003 restatement of NorthWestern's reported revenues. If the Court compares the $3.2 million of alleged overstated revenue at NCS to NorthWestern's total revenue of $1,748,309,000, there was less than a 0.19% overstatement of NorthWestern's revenue.

Although there is no numerical threshold, the Court finds as a matter of law that a 0.19% overstatement of $3.2 million in revenue in a company that reports $1,748,309,000 in gross revenue is "so insignificant, in relation to the total mix of data available, that it would not have mattered to a reasonable investor." *Gebhardt*, 335 F.3d at 829. In *Gebhardt*, where materiality was not determined as a matter of law, the total revenue overstatement was $287 million and the overstatement of net income was 8%. 335 F.3d at 827. Another case in which materiality was adequately alleged in the complaint was *In re Stellent, Inc. Sec. Litig.*, 326 F.Supp.2d 970, 985 (D.Minn. 2004), where "the alleged improprieties affected up to $7 million dollars against reported revenues of $26.6 million." The *Stellent* court held that, "[f]acts regarding these transactions, which affected more than 25% of earnings, would be highly relevant to any investor." *Id.* In contrast, in *Parnes*, assets were overstated by $6.8 million, which represented only 2% of the defendant's total assets, and the Court determined the overstatement was immaterial as a matter of law given the high-risk/high-yield investment opportunity in the company. 122 F.3d at 547. Likewise, in *Romine v. Acxiom Corp.*, 296 F.3d 701, 706 (8th Cir. 2002), the Eighth Circuit affirmed the dismissal of a complaint, finding an alleged $2.3 million adjustment to employee benefit reserves immaterial as a matter of law where the defendant's quarterly earnings were $15.7 million on revenues of $211.5 million. The court in *Romine* held that an overstatement of quarterly earnings of $.02 per share was immaterial where the reported quarterly earnings were $.18 per share. *Id.* The overstatement in the present case in relation to the parent corporation's total financial picture is even less than the overstatements in *Parnes, supra*, and *Romine, supra*, where the courts determined the overstatements

---

[2]The Court will take judicial notice of NorthWestern's financial statements as they are public records and may be considered on a motion to dismiss. *See Stahl v. United States Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) (holding that "[t]he district court may take judicial notice of public records and may thus consider them on a motion to dismiss.").

12

were quantitatively immaterial as a matter of law and is distinguishable from the overstatements in *Gebhardt, supra,* and *Stellent, supra,* where the complaints sufficiently alleged materiality.

The Court recognizes qualitative factors must also be examined to determine if an overstatement of revenue that is quantitatively immaterial would nevertheless be viewed by the reasonable investor as substantially altering the total mix of available information.

One qualitative factor argued by the SEC is that the misstatement in this case was designed to meet analyst's expectations. Given the immaterial quantitative nature of NCS's alleged overstated revenue in comparison to NorthWestern's reported revenue, NCS's overstatement was not significant in meeting analyst's expectations, and thus, would not have been viewed by the reasonable investor as substantially altering the total mix of available information.

Another qualitative factor is the concern that investors might have about the integrity of NorthWestern's management as a result of the overstatement of revenue at NCS. The Court notes that Defendant was not a member of NorthWestern's senior management. The SEC refers to Defendant as the chief executive officer of NCS, which the Court will accept as true for purposes of the present motion. But being the head of a small subsidiary does not make Defendant a member of NorthWestern's senior management. On the other hand, the failure by NorthWestern's senior management to discover the alleged overstatements before they were incorporated into NorthWestern's financial statements may be of some concern to a reasonable investor. The Court does not find, however, that this failure to discover NCS's overstatement of revenue would be viewed by the reasonable investor as substantially altering the total mix of available information regarding NorthWestern.

The SEC argues that overstating revenue, such as in *Gebhardt, supra,* is more significant to an investor than overstating assets, as in *Parnes, supra.* The Court does not disagree with this general statement, but notes in *Gebhardt,* the panel explained that, "[m]ore than a revenue loss was involved here. There was also a loss in net income [of 8%], a figure that may be of more

13

significance to investors." 335 F.3d at 830. The Eighth Circuit further held, "[i]n order to take this decision away from the jury, the circumstances must make it obvious why a reasonable investor would not be concerned about the facts misrepresented." *Id.* In the present case, as explained above, the Court does not have any information to determine what the loss in net income might have been from the alleged overstated revenue at NCS, but the Court finds it is obvious that a reasonable investor would not be concerned about a $3.2 million overstatement of revenue ($1.9 million of which was earned, but reported in the wrong reporting period), in a company that reports $1,748,309,000 in total revenue.

Based upon the above discussion, the Court does not find any qualitative factors that would render the quantitatively immaterial overstatement of NCS's revenue to be viewed by the reasonable investor as substantially altering the total mix of available information concerning NorthWestern. Accordingly, Thielbar is entitled to dismissal of the fraud claims requiring a showing of materiality. Thus, the First, Second, Third, Fifth, Sixth and Seventh Claims will be dismissed.

### C.     Scienter

Thielbar contends the Complaint fails to adequately plead facts giving rise to a strong inference of the required state of mind, i.e. scienter. "'Scienter means the intent to deceive, manipulate, or defraud.'" *Kushner v. Beverly Enter., Inc.*, 317 F.3d 820, 827 (8th Cir. 2003) (quoting *Green Tree*, 270 F.3d at 653 (internal quotations omitted)). The Eighth Circuit explained that, "a strong inference of the required scienter may arise where the complaint sufficiently alleges that the defendant (1) benefitted in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor." *Id.*

The Complaint alleges Thielbar put tremendous pressure on his staff to meet financial targets, demanded information concerning their sales prospects, and then used this information to instruct NCS's accountant to record revenue on non-existent contracts. It is further alleged Thielbar received

both verbal and written warnings from the accountant that false revenue had been recorded but he refused to authorize reversal of the false revenue and continued after the warnings to instruct that false revenue be recorded. Further, the Complaint alleges Thielbar lied to auditors to cover up the misstatements of revenue. Thielbar knew NCS's financial statements would be incorporated into NorthWestern's publicly filed financial statements. Finally, the Complaint alleges Thielbar's compensation was affected by NCS's performance. The Court finds the Complaint adequately pleads facts giving rise to a strong inference of scienter.

## 2. Falsified Books & Records and Lack of or Circumventing Internal Controls - Fourth, Eighth and Ninth Claims

Section 13(b)(5) of the Exchange Act prohibits persons from, among other things, circumventing internal controls and falsifying books, records and accounts. *See* 15 U.S.C. § 78m(b)(5); 17 C.F.R. § 240.13b2-1. The Fourth Claim in the Complaint alleges Thielbar instructed an accountant to record false revenue, persisted in the conduct even when the accountant complained it was incorrect and tried to obtain written documentation to verify the revenue. Thielbar is also alleged to have lied to the audit committee and the external auditors about the misstatement of revenue he directed the accountant to record. Thielbar does not dispute the SEC's contention that neither scienter nor materiality are elements of a Section 13(b)(5) claim. The Court finds the allegations in the Complaint are sufficient to state a claim upon which relief may be granted as to the falsified books and records claim and circumventing or failing to implement a system of internal accounting controls stated in the Fourth Claim.

The Eighth Claim alleges that NorthWestern failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets, thereby violating Section 13(b)(2)(A) of the Exchange Act. The Ninth Claim alleges that NorthWestern failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain accountability for assets, and that the recorded accountability for assets

is compared with the existing assets at reasonable intervals, thereby violating Section 13(b)(2)(B) of the Exchange Act. Thielbar, among others, is alleged to have known of NorthWestern's violation of Sections 13(b)(2)(A) and 13(b)(2)(B) and substantially assisted NorthWestern in committing these violations. Thielbar does not dispute the SEC's contention that Section 13(b)(2) claims do not require a showing of materiality or scienter. *See SEC v. World-Wide Coin Invest., Inc.*, 567 F.Supp. 724, 748-50 (N.D.Ga. 1983) (holding that the SEC is not required to establish materiality or scienter to prove a violation of the "books and records" or "internal controls" provisions in Section 13(b)(2) of the Exchange Act). The Court finds at this stage of the proceedings that the Eighth and Ninth Claims state claims upon which relief may be granted. The Complaint contains several allegations regarding Thielbar's conduct in falsifying the books and records of NCS, which is a subsidiary of NorthWestern, and in circumventing or failing to implement internal accounting controls, thereby aiding and abetting NorthWestern's violations of Section 13(b)(2). Thus, the Motion to Dismiss will be denied as to the Eighth and Ninth Claims. Accordingly,

> IT IS ORDERED that Defendant Thielbar's Motion to Dismiss, Doc. 26, is granted as to the First, Second, Third, Fifth, Sixth and Seventh Claims in the Complaint and is denied as to the Fourth, Eighth and Ninth Claims in the Complaint.
>
> Dated this 28th day of September, 2007.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: _____
         DEPUTY