UNITED STATED DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION



FILED
SEP 24 2008

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | * * * | CIV. 06-4253 |
| Plaintiff, | * * | |
| -vs- | * * | ORDER DENYING DEFENDANT'S MOTION TO DISMISS |
| BART BART A. THIELBAR | * | |
| DAVID A. MONAGHAN | * | |
| KEITH W. BEACHLER | * | |
| JANA L. QUAM AND | * | |
| CARY B. GRISWOLD | * | |
| Defendants. | * * | |

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

Pending before the Court is Defendant, Bart A. Thielbar's, Motion to Dismiss Counts 1-9 of Plaintiff, Securities and Exchange Commission's, Amended Complaint which alleges that Defendant violated various securities laws.

BACKGROUND

The facts will be stated in the light most favorable to the Plaintiff, as the non-moving party in this motion to dismiss. From April 2000 until June 2002, Defendant served as chief executive officer of Northwestern Communications Solutions ("NCS'), an operating division of NSG, the wholly owned subsidiary of Northwestern Corporation ("Northwestern") that conducted Northwestern's utility operations. Northwestern was formerly a Fortune 500

company that was registered with the Securities and Exchange Commission ("S.E.C."). During this time, Defendant directed the primary staff accountants at NCS to record approximately $3.2 million of unearned revenue, and $1.5 million in fictitious profits during the fourth quarter of 2001 and the first two quarters of 2002, and to improperly reclassify approximately $1 million of unsubstantiated assets to a goodwill account at the close of 2001 to avoid a year-end charge against income. The recording of unearned revenue resulted from Defendant's misuse of the percentage-of-completion accounting method in which estimated revenue from potential sales leads was improperly recorded as "work in progress" before a prospective customer had even agreed to the transaction. Additionally, Defendant directed staff accountants to improperly record percentage amounts exceeding the actual work completed on the job.

During the period of NCS' misstatements, many of Northwestern's non-utility operations were not performing well and the company needed cash to service its debt from the purchase of Montana Power Company, which quadrupled the size of its utility operations. In the fall of 2002, Northwestern was planning to generate revenue by completing its sale of more than $800 million in securities offerings to the public.

The misstatements on NCS' financial statements, which were subsequently uncovered by an internal audit at NCS during the summer of 2002, caused Northwestern to misstate its revenue and net income in its public filings during the fourth quarter of 2001 and the first and second quarters of 2002. Specifically, approximately $1.3 million in revenue was recorded on sales leads that had never closed and approximately $1.9 million was recorded in periods before the revenue was earned. (Compl. ¶ 4.) NCS' improper revenue entries caused Northwestern to overstate its fourth quarter net income by approximately 17.00% in financial statements accompanying its 2001 Form 10-K. (Compl. ¶ 5.) Additionally, in the first and second quarters of 2002, NCS' improper revenue entries caused Northwestern to overstate its reported net income in financial statements accompanying its Form 10-Q during these quarters by approximately 1.97% and 1.10%, respectively. (Compl. ¶¶ 6, 7.)

Defendant knew that he was improperly using the percentage of completion method to boost NCS' revenue and net income and that these misstatements would be incorporated into Northwestern's publicly filed financial statements. Defendant required staff accountants to submit NCS' financial statements to him for review and approval each month before sending

2

them to NSG which, in turn, consolidated them into Northwestern's financial statements. Upon receipt of the preliminary income statement, if NCS' financial results were short of forecast, Defendant then demanded that NCS sales staff provide him with information on any additional sales they had closed or anticipated closing. Defendant then instructed staff accountants to record unearned revenues on these additional "jobs" before finalizing the income statement. Despite receiving both verbal and written warnings from the accountant that false revenue had been recorded, the Defendant refused to authorize reversal of the false revenue and continued after the warnings to instruct that false revenue be recorded.

In July 2002, Northwestern conducted an internal financial audit of NCS. In early August 2002, the internal auditor issued his draft report which recommended a number of adjusting entries to correct NCS' improper percentage-of completion revenue recognition and goodwill misstatements. Prior to issuing a final report, the internal auditors invited NCS management to prepare written responses to the items. Defendant did not prepare responses to these questions for over two and one-half months, causing the final audit report to be delayed until the end of October, after Northwestern's registration of more than $800 million in securities offerings to the public.

On January 29, 2007, Defendant filed a Motion to Dismiss Plaintiff's Complaint (Doc. 26) pursuant to 12(b)(6) for failure to state a claim upon which relief may be granted. In his motion, Defendant sought to dismiss nine causes of action which allege that Defendant violated various sections of the Securities Exchange Act of 1934 ("1934 Act") and the Securities Act of 1933 ("1933 Act"). Specifically, Counts 1 and 2 of Plaintiff's Complaint alleged that Defendant perpetrated fraud against the investors of Northwestern in violation of sections 17(a)(1), (2), and (3) of the 1933 Act, 15 U.S.C. § 77q(a). Count 3 alleged that Defendant perpetrated fraud against the investors of Northwestern in violation of Rule 10(b)(5) of the 1934 Act, 17 C.F.R. § 240.10b-5, or in the alternative, as stated in Count 5, that Defendant aided and abetted Northwestern's violations of the same Act. In Count 4, Plaintiff alleged that Defendant violated section 13(b)(5) of the 1934 Act, 15 U.S.C. § 78m(b)(5), which prohibits any person from knowingly circumventing or failing to implement a system of internal accounting controls or knowingly falsifying any book, record or account. Counts 6 and 7 alleged that Defendant aided and abetted Northwestern in filing materially misleading annual and current reports with the

S.E.C. in violation of various rules under section 13(a), 15 U.S.C. § 78m(a), of the 1934 Act. Finally, Counts 8 and 9 of Plaintiff's Complaint alleged that Defendant aided and abetted Northwestern in falsifying its books and records and in violating internal accounting controls in violation of section 13(b) of the 1934 Act, 15 U.S.C. § 78m(b).

On September 28, 2007, the Court ruled on Defendant's motion to dismiss. (Doc. 38.) In its Order (Doc. 38), the Court granted Defendant's motion to dismiss as to Counts 1-3, and 5-7 of Plaintiff's Complaint and denied Defendant's motion to dismiss as to Counts 4, 8, and 9. The Court's decision to dismiss Counts 1-3, and 5-7 was based on the Court's finding that Plaintiff failed to prove materiality, an essential element of these claims. The Court stated in its Order that in determining whether Defendant's misrepresentations are quantitatively material, the Court must compare items alleged to be overstated on NCS' financial statement to like items on Northwestern's financial statement. The Court accordingly rejected Plaintiff's materiality computations which compared NCS' alleged revenue overstatements to Northwestern's net income, finding that those two items on the financial statements are not alike. Although the Court noted that misrepresentations of net income may be more material to investors than misrepresentations of revenue, Plaintiff failed to quantify any alleged misrepresentations regarding NCS' net income and the Court was therefore unable to use net income figures in its materiality analysis. Instead, the Court compared NCS' alleged overstated revenue with Northwestern's revenues as a whole and found that the misrepresentations were quantitatively immaterial.

However, since materiality is not an essential element of Counts 4, 8, and 9 of Plaintiff's Complaint, the Court found that Plaintiff had pleaded facts sufficient to state a claim upon which relief may be granted as to those claims.

On October 25, 2007, the parties filed a Stipulation Relating to Amended Complaint, wherein Defendant agreed that Plaintiff may file and serve the Amended Complaint attached to its motion, provided that Defendant would retain the right to respond to the Amended Complaint, including the right to move for dismissal under Federal Rules of Civil Procedure 12(b)(6) and 9(b). (Doc. 40.) In light of this stipulation, the Court granted Plaintiff's motion to file an Amended Complaint in an Order dated October 29, 2007. (Doc. 43.)

Defendant now moves to dismiss Plaintiff's Amended Complaint on a number of

grounds. (Doc. 50) First, Defendant argues that Plaintiff has still failed to plead materiality since the figures it uses in its materiality analysis rest upon comparisons of dissimilar financial data. Accordingly Defendant seeks to dismiss Counts 1-3 and 5-7 on these grounds. Second, Defendant seeks to dismiss Counts 1-3 on the basis that he cannot be held as a primary violator of Section 17(a)(1), (2), and (3) of the 1933 Act, 15 U.S.C. § 77q(a), because he did not have a meaningful connection to Northwestern's public offering of securities or the sales process by which the company's securities were offered and sold to the public. Third, Defendant argues that he may not be held liable for aiding and abetting Northwestern in violating section 10(b)(5) (Count 5), 17 C.F.R. § 240.10b-5, and section 13(a) (Counts 6, 7), 15 U.S.C. § 78m(a), of the 1934 Act because Plaintiff has not sufficiently alleged a primary violation on behalf of Northwestern or that Defendant possessed the scienter necessary to be found liable as an aider and abettor of Northwest's securities violations. Finally, Defendant argues that Count 9 should be dismissed because Plaintiff has failed to plead facts sufficient to state a claim under *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007), that Defendant aided and abetted Plaintiff's violation of section 13(b)(2)(B) of the 1934 Act which mandates that certain companies devise and maintain a system of internal accounting controls sufficient to ensure preparation of financial statements in conformity with generally accepted accounting principles.

## LEGAL STANDARD

In ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *McMorrow v. Little,* 434 (8th Cir. 1997). Because the pleading rules require only "notice" pleading, rather than detailed fact pleading, a court must construe a plaintiff's allegations liberally, and should only dismiss a complaint if a plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 127 S.Ct. at 1974. However, a court need not accept as true "legal conclusions even if they are cast in the form of factual allegations...or go to the merits of the suit." *Ashley v. U.S. Dept. of Interior,* 408 F.3d 997, 1000 (8th Cir. 2005) (internal quotations and citations omitted).

In deciding whether to dismiss, a court may consider only the facts alleged in the

pleadings, documents attached as exhibits[1] or incorporated by reference in the pleadings,[2] and public documents.[3] Legal memorandums, such as a memorandum opposing a motion to dismiss, do not constitute pleadings under Rule 7(a) and therefore, a court may not take into account any additional facts asserted therein. *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989) (*citing Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) (stating that "it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss").

## DISCUSSION

Defendant seeks to dismiss the claims against him on a number of grounds. First, Defendant argues that Plaintiff has failed to plead facts supporting the contention that overstatements as to NCS' net income are material in relation to Northwestern's overall net income so as to violate Section 17(a) (Counts 1, 2) and 10(b) (Counts 3, 5) or 13(a) (Counts 6,7), Rule 12b-20 thereunder, of the 1934 Act. Second, Defendant seeks to dismiss Counts 1-3 on the basis that he cannot be held as a primary violator of sections 17(a)(1), (2), and (3) of the 1933 Act because he did not have a meaningful connection to Northwestern's public offering of securities or the sales process by which the company's securities were offered and sold to the public. Third, Defendant argues that he may not be held liable for aiding and abetting Northwestern in violating section 10(b) (Count 5) and section 13(a) (Counts 6, 7) because Plaintiff has not sufficiently alleged a primary violation on behalf of Northwestern or that Defendant possessed the scienter necessary to be found liable as an aider and abettor of Northwestern's securities

---

[1] *Stahl v. USDA*, 327 F.3d 697, 700-01 (8th Cir. 2003) (finding that district court properly considered contract documents that were attached to motion to dismiss without converting motion into one for summary judgment).

[2] *Morgan Distrib. Co., Inc. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989) (*citing Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) (stating that "it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss").

[3] *Stahl*, 327 F.3d at 700-01 (finding that district court properly considered certain public records in ruling on a motion to dismiss under Rule 12(b)(6)).

violations. Finally, Defendant argues that Count 9 should be dismissed because Plaintiff has failed to plead facts sufficient to state a claim under *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007), that Defendant aided and abetted Plaintiff's violation of section 13(b)(2)(B) of the 1934 Act which mandates that certain companies devise and maintain a system of internal accounting controls sufficient to ensure preparation of financial statements in conformity with generally accepted accounting principles.

### A.     Materiality - Counts 1- 3, 5-7

The anti-fraud provisions of both the 1933 and 1934 Acts include an element of materiality. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) ("To present a cognizable claim for securities fraud, a plaintiff must allege that a defendant made misrepresentations that were material."). Section 17(a) of the 1933 Act (Counts 1, 2), 15 U.S.C. § 77q(a), and Section 10(b) of the 1934 Act and Rule 10b-5 thereunder (Counts 3, 5), 15 U.S.C. § 240.10b-5, prohibit fraudulent conduct or practices in connection with the offer or sale of securities. These anti-fraud provisions forbid making *material* misstatements or omissions in connection with the offer or sale of a security by means of interstate commerce. Section 13(a) of the 1934 Act (Counts 6, 7) requires the issuer of a security to file annual and quarterly reports with the SEC as well as notify the agency on a Form 8-K of major corporate events such as large acquisitions and dispositions of assets or director resignations. 15 U.S.C. § 78m(a). A company filing such a report pursuant to section 13(a) must include additional, *material* information as will make the filing not misleading under the surrounding circumstances. 17 C.F.R.§ 240.12b-20 (providing that required filings with the SEC must include "such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading.")

The anti-fraud provisions' materiality element is satisfied only if there is "a substantial likelihood" that the misrepresentation would have been viewed by a reasonable investor as having significantly altered the total mix of information made available to the investor. *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829 (8th Cir. 2003). As this inquiry "requires delicate assessments of inferences a reasonable investor would draw from a given set of facts," materiality is ordinarily a question of fact for the jury. *In re Control Data Corp. Sec. Litig.*, 933

F.2d 616, 621 (8th Cir. 1991) (citation omitted). However, "where a reasonable investor could not have been swayed by an alleged misrepresentation, a court may determine, as a matter of law, that the alleged misrepresentation is immaterial." *Parnes*, 122 F.3d at 546.

There is no formulaic approach to assessing the materiality of an alleged misrepresentation. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 163 (2d Cir. 2000) (citation omitted); *see Gebhardt*, 335 F.3d at 829. In addition to the quantitative magnitude of the misrepresentation, courts must consider a broad range of qualitative factors in its assessment. *See Gebhardt*, 335 F.3d at 830 (stating that a court must look at quantitative measures in light of the particular circumstances of the company in question in determining materiality). "In order to take this decision away from the jury, the circumstances must make it obvious why a reasonable investor would not be concerned about the facts misrepresented." *Id.*. at 830.

   i. *Quantitative Factors*

The Court acknowledged in its Order (Doc. 38), that in determining whether Defendant's misrepresentations are quantitatively material, the Court must compare items alleged to be overstated on NCS' financial statement to like items on Northwestern's financial statement. The Court accordingly rejected Plaintiff's materiality computations which compared NCS' alleged revenue overstatements to Northwestern's net income, finding that those two items on the financial statements are not alike. Although the Court noted that misrepresentations of net income may be more material to investors than misrepresentations of revenue, Plaintiff failed to quantify any alleged misrepresentations regarding NCS' net income and the Court was therefore unable to use net income figures in its materiality analysis. Instead, the Court compared NCS' alleged overstated revenue with Northwestern's revenues as a whole and found that the misrepresentations were quantitatively immaterial.

Defendant argues that Plaintiff's attempt to cure the deficiency in its initial complaint as to materiality has failed because the figures Plaintiff uses in its Amended Complaint still suffer from the same defect in that they rest upon comparisons of dissimilar financial data. This time around, Plaintiff provides the Court with figures representing NCS' overstated net income during the relevant periods: (1) $740,000 during fourth quarter 2001; (2) $593,000 during first quarter 2002; and (3) $173,000 during second quarter 2002. Plaintiff compared these numbers to the net

income of Northwestern during the same periods and found that the overall effect was to inflate Northwestern's net income during those periods by 17.00%, 1.97% and 1.10%, respectively. Defendant argues that numbers used by Plaintiff in its analysis reflect Northwestern's gross margin rather than the company's net income and as a result, Plaintiff is once again comparing apples and oranges since operating and interest expenses have not been deducted out of the gross margin numbers, whereas net income reflects theses deductions. In support of this contention, Defendant points out that in Exhibit B, which was prepared by a staff accountant, many of the numbers in the column titled "margin" match the "fictitious profit" numbers listed in the complaint for the same jobs.

Because Defendant's assertion hinges not on a legal deficiency, but rather on a factual question regarding whether the numbers as alleged in Plaintiff's complaint represent gross margin or net income, it does not provide a sufficient basis upon which the Court may dismiss these claims. The Court is clear on the fact that net income and gross margin represent different numbers in that operating and interest expenses are deducted from the former, but not the latter figure. If ultimately the "fictitious profit" numbers do reflect gross margin, the Court is skeptical of Plaintiff's argument that operating and interest expenses allocated to a particular job do not correlate at all with changes in gross margin and therefore that NCS' overstated gross margin had a dollar-for-dollar impact on its and Northwestern's net income. However, the Court must not take the strength of Plaintiff's claims into consideration in ruling upon a motion to dismiss since the issue in evaluating such a motion, "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheur v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (citation omitted).

    *ii.*    *Qualitative Factors*

The Court next examines the materiality analysis undertaken by other courts in order to determine whether NCS' overstated net income had a material effect on Northwestern's net income. In doing so, the Court keeps in mind that in determining materiality, courts must look at quantitative measures in light of the particular circumstances of the company. *Gebhardt*, 335 F.3d at 829. In *Parnes*, for example, the Eighth Circuit held a 2% overstatement of assets was immaterial as a matter of law because such a small increase in risk in a high-risk/high-yield

company such as the one at issue in that case would not have a significant affect upon investor expectations. *Parnes,* 122 F.3d at 547. However, unlike in *Parnes*, investors in *Gebhardt* were not making such a risky investment and therefore the court concluded that an 8% overstatement in net income, a line item of significant importance to investors, was not immaterial as a matter of law. *Gebhardt*, 335 F.3d at 830. As in *Gebhardt*, the court in *In re Stellent, Inc.* held that the plaintiff had adequately alleged materiality in the complaint, finding that the defendant's fraudulent transactions, which affected more than 25% of earnings, would be highly relevant to any investor. *In re Stellant*, 326 F.Supp.2d 970, 985 (D. Minn. 2004). The court in *Stellant* noted that the fact that the company's stock price significantly changed upon release of the fraudulent information served as additional proof that investors considered this overstatement to be material. *Id.* (citing *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding. Corp.*, 320 F.3d 920, 949 (9th Cir. 2003)).

Considering the nature of Northwestern's business and the precarious financial position in which the company was in, the Court finds that NCS' misrepresentations as to income earned during that period which allegedly caused Northwestern's net income to be overstated by 17.00% during the fourth quarter of 2001, and 1.97% and 1.10% during the first and second quarters of 2002, are not "so insignificant, in relation to the total mix of data available, that it would not have mattered to a reasonable investor." *Gebhardt*, 335 F.3d at 829. Certainly, Plaintiff has not alleged that these misrepresentations are as material as those made by the defendant in *Stellar* as to have significantly altered Northwestern's stock price. However, such an element need not necessarily be present in order for the Court to conclude that these overstatements in net income, particularly in the fourth quarter of 2001, may very well have mattered to a reasonable investor. Plaintiff clearly alleges in its complaint that the profitability of Northwestern was closely watched by analysts and investors alike for a number of reasons. One reason regarded the fact that Northwestern needed to service its debt from the purchase of Montana Power which essentially quadrupled the size of the company's utility operations. Additionally, the company was planning to complete its sale of more than $800 million in securities offerings during 2002 to raise income in order to compensate for the continued poor performance of its non-utility subsidiaries. Northwestern's net income preceding this sale would very likely influence the price at which these shares may sell and therefore the amount of

revenue the company would generate.

As a result of the foregoing findings, the Court now declines to dismiss Counts 1, 2, 3, 5, 6, and 7 on the basis that Plaintiff failed to adequately allege materiality in its Amended Complaint.

**B.**     ***Primary Liability under Sections 17(a)(1), (2), (3) of the 1934 Act - Counts 1, 2, 3***

Section 17(a)[4] of the 1933 Act (Counts 1, 2, 3) forbids making "(1) a material misstatement or omission (2) in connection with the offer or sale of a security (3) by means of interstate commerce...." *S.E.C. v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007); 15 U.S.C. § 77q. Violations of section 17(a)(1) also require scienter which is defined as "an intent to deceive, manipulate, or defraud." *Aaron v. SEC*, 446 U.S. 680, 686 n.5, 701-02, 100 S.Ct. 1945, 1950, 1958, 64 L.Ed.2d 611 (1980). In its Order (Doc. 38), the Court found that Plaintiff had adequately pleaded scienter and Defendant does not now contest that finding. Instead, Defendant renews his argument that he cannot be held as a primary violator of Section 17(a)(1), (2), and (3) of the Securities Act (Counts 1-3), 15 U.S.C. § 77q(a)(1), (2), and (3), because he did not have a meaningful connection to Northwestern's public offering of securities or the sales process by which the company's securities were offered and sold to the public.

The Eighth Circuit has held that a defendant will be found to have made a material misstatement or omission "in connection with the offer or sale of a security" if the defendant, with the required scienter, either *makes or causes to be made* such a statement which is then used in connection with the offer or sale. *In re Charter*, 443 F.3d 987, 992 (8th Cir. )("Any defendant who does not make or affirmatively cause to be made a fraudulent misstatement or omission,...is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any sub-part of Rule 10b-5).[5] In *In re Charter*, investors brought securities fraud class action against

---

[4] Section 17(a) provides in relevant part: "It shall be unlawful for any person in the offer or sale of any securities...by the use of any means or instruments of transportation or communication in interstate commerce or by use of mails, directly or indirectly...to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact...." 15 U.S.C. § 77q.

[5] Note that the elements of violations under 17(a) and 10(b) are essentially the same. *Savino v. E.F. Hutton & Co.*, 507 F.Supp. 1225, 1231 (S.D.N.Y. 1981) ("Since Section 17(a),

various parties, including the corporation's vendors. *Id.* at 989. The court in *In re Charter* stated that even if the vendor defendants entered into sham transactions with the company with the knowledge that the company intended to account for them improperly, the vendors could not be held primarily liable under § 10(b) in that case because the company, and not the defendants, was the actual party responsible for the improper accounting. *Id.* at 992-93.

Applying the rule adopted by the Eighth Circuit in *In re Charter*, the Court finds that Defendant may be held primarily liable for violations of Sections 17(a)(1), (2), and (3) of the 1933 Act. Unlike the defendants in *In re Charter* who did not cause misstatements in the issuing company's financial statements to be made, Defendant in this case is alleged to have supplied Northwestern with fraudulent financial information which he knew would be incorporated into Northwestern's publicly filed financial statements.

## C.   *Aiding & Abetting Liability - Counts 5, 6, 7*

In order to state a claim for aiding and abetting a violation of the securities laws, a plaintiff must allege the following: (1) the existence of a securities law violation by the primary party; (2) "knowledge" of the violation on the part of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in the achievement of primary violation. *K&S P'ship v. Cont'l Bank*, 952 F.2d 971, 977 (8th Cir. 1991) (*citing FDIC v. First Interstate Bank of Des Moines, N.A.*, 885 F.2d 423, 429 (8th Cir. 1989).

Defendant argues that Plaintiff has not pleaded facts sufficient to state a claim for aiding and abetting Northwestern's violation of Section 10(b) (Count 5) and Section 13(a) (Counts 6, 7) of the 1934 Act. First, Defendant argues that there are no allegations in the Amended Complaint which sufficiently allege a primary violation of these laws by Northwestern. Second, Defendant renews his claim that Plaintiff has not alleged that Defendant possessed the knowledge or scienter necessary to be found liable as an aider and abettor of Northwestern's securities violations.

---

like Section 10(b), sounds in fraud, similar allegations are required to state a claim under that section.").

12

### i. Primary violation by Northwestern

A primary violation is a *sine qua non* for aiding and abetting liability; without a primary violation, an aiding and abetting claim fails. *Stokes v. Lokken*, 644 F.2d 779, 782 (8th Cir. 1981), *rev'd on other grounds*, *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 2076-80, 100 L.Ed.2d 658 (1988). In his motion to dismiss, Defendant argues that Plaintiff has not sufficiently alleged that Northwestern possessed the scienter necessary to state a claim for primary violations of sections 13(a) (Counts 6,7) and 10(b) (Count 5) of the 1934 Act.

The United States Supreme Court examined the language and the legislative history of section 10(b) of the 1934 Act and concluded that Congress intended scienter to be a necessary element of a violation of that law. *Aaron*, 446 U.S. at 692 (holding that "scienter is an element of a violation of § 10(b) and Rule 10b-5 regardless of the identity of the plaintiff or the nature of the relief sought."). Because Congress expressly delineated different standards of fault for various violations under the 1933 and 1934 Acts, the Court examined the particular language of section 10(b) and found that use of the words "manipulative," "device," and "contrivance" in the language of the statute strongly suggested that section 10(b) was intended to proscribe knowing or intentional misconduct. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197-98, 200, 96 S.Ct. 1375, 1383-84, 47 L.Ed.2d 668 (1976) (noting, for example, that under 15 U.S.C. § 77k(b)(3)(B), accountants may be liable for negligent misrepresentations in the registration statement whereas 15 U.S.C. § 77k(a) imposes strict liability upon issuers for the same offense). As additional support for its holding, the Court noted that there is no indication in the legislative history regarding section 10(b) that Congress intended anyone to be made liable for violations of this provision unless he acted in bad faith. *Id.* at 206.

Similar to the analysis used by the Supreme Court in finding that violations of section 10(b) required scienter, the Second Circuit in *S.E.C. v. McNulty* examined the language and legislative history of section 13(b) of the Act to determine the standard of fault required for civil violations under that section. *S.E.C. v. McNulty*, 137 F.3d 732, 740-41 (2d Cir. 1998). Ultimately, the court in *McNulty* concluded that violations of section 13(a), unlike violations of section 10(b), did not require proof of scienter. *Id.* at 741. Specifically, the court noted that the S.E.C. found that section 13(b) "contained no words indicating that Congress intended to impose a scienter requirement" and that the agency's interpretation of its own regulations was entitled to

deference. *Id.* (*citing Promotion of the Reliability of Financial Information and Prevention of the Concealment of Questionable or Illegal Corporate Payments and Practices,"* Exchange Act Release No. 34-15570, 16 S.E.C. Docket 1143, 1151, 1979 WL 173674 at *9-10 (Feb. 15, 1979)). Additionally, the *McNulty* court found that by amending the statute so that criminal liability is limited only to those who "knowingly" falsify information filed in accordance with section 13(b), Congress necessarily implied that such knowledge was not required for civil violations under the statute. *Id.*

Examining the text and the legislative history of section 13(a), the Court finds that violations of that section, unlike violations under section 10(b), do not require scienter. *Accord Ponce v. S.E.C.*, 345 F.3d 722, 737 n.10 (9th Cir. 2003); *McNulty*, 137 F.3d at 740-41 (*citing SEC v. Koenig*, 469 F.2d 198, 200 (2d Cir. 1972) (upholding finding of § 13(a) liability, without mention of scienter, of top corporate officer for failure to include required information in SEC reports); *S.E.C. v. Savory Indus.*, 587 F.2d 1149, 1167 (D.C. Cir. 1978) (reporting provisions of § 13 not intended to be anti-fraud provisions, and therefore do not require scienter). Unlike section 10(b) of the 1934 Act, section 13(a) does not contain any words indicating that Congress intended to impose a scienter requirement for civil violations under that Act.[6] Instead, it appears that as the court in *McNulty* found with regard to violations under section 13(b), that Congress chose to impose a scienter requirement only upon criminal, and not civil violations of section

---

[6] Section 13(a) provides that: Every issuer of a security registered pursuant to section 78l of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security (1) such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 78l of this title, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962. (2) such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe. Every issuer of a security registered on a national securities exchange shall also file a duplicate original of such information, documents, and reports with the exchange. 15 U.S.C. § 78m(a) (1976).

13(a) *See* 15 U.S.C. 78ff.[7]

Since the Court finds that Northwestern need not possess scienter in order to be liable for a primary violation under section 13(a), the Court will now focus its attention on whether Plaintiff has pleaded facts sufficiently alleging that the company possessed the scienter necessary to be liable for a violation under section 10(b). To prove a defendant acted with scienter, the SEC must establish "an intent to deceive, manipulate, or defraud." *Aaron*, 446 U.S. at 686 n.5. In the Eighth Circuit, recklessness satisfies the scienter requirement. *Fla. State Bd. of Educ. v. Green Tree Fin. Corp.*, 270 F.3d 645, 653 (8th Cir. 2001). Recklessness, as defined in the Eighth Circuit, is conduct which represents "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers ." *Green Tree*, 270 F.3d at 654 (*quoting Camp v. Dema*, 948 F.2d 455, 461 (8th Cir. 1991). This standard of recklessness is essentially a lesser form of intent, *S.E.C. v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992), implying the danger is "either known to the defendant or is so obvious that the defendant must have been aware of it." *Green Tree*, 270 F.3d at 654 (*quoting Camp v. Dema,* 948 F.2d at 461).

The Court finds that the Plaintiff has sufficiently alleged that Northwestern possessed the scienter necessary to be found primarily liable for a violation of section 10(b). The Court cannot say at this time that Northwestern's failure to detect NCS' recognition of net income from non-existent contracts is not an extreme departure from the standards of ordinary care given the Court's finding that the effect of these misrepresentations *may* be significant enough, in relation to the total mix of data available, so as to have mattered to reasonable investors. In evaluating this motion to dismiss, the Court is bound to draw all reasonable inferences in favor of the Plaintiff, the non-moving party in case.

In sum, the Court declines to dismiss Count 5 of Plaintiff's complaint on the basis that Plaintiff has not sufficiently alleged that Northwestern possessed the scienter necessary to be a primary violator of section 10(b). Additionally, since violations of 13(a) do not require scienter,

---

[7] 15 U.S.C. § 78ff provides in relevant part that "[a]ny person who willfully and knowingly makes, or causes to be made, any statement in any..., report,...required to be filed under this chapter or any rule or regulation thereunder..., which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than $10,000, or imprisoned not more than five years, or both,...."

the Court declines to dismiss Counts 6 and 7 on this basis as well.

### ii. Possession of requisite scienter by Defendant

Knowledge of a violation on the part of an aider and abettor is a critical element of aiding and abetting liability. *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991). "If it were otherwise, aiding and abetting would be indistinguishable from simply aiding." *Id.* Thus, in order to survive a motion to dismiss, a plaintiff must allege some knowledge on the part of the alleged aider and abettor of a primary violation.

The Eighth Circuit has been clear, however, in stating that the extent of knowledge necessary for aiding and abetting liability "remains flexible and must be decided on a case-by-case basis." *Id.* In determining the level of knowledge required, a court should consider the "knowledge" and "substantial assistance" elements of aiding and abetting liability relative to one another and "where there is minimal showing of substantial assistance, a greater showing of scienter is required." *Metge v. Baehler*, 762 F.2d 621 (8th Cir. 1985) (*quoting Stokes*, 644 F.2d at 784). For example, "[a] party who engages in atypical business transactions or actions which lack business justification may be found liable as an aider and abettor with a minimal showing of knowledge," whereas "a party whose actions are routine and part of normal everyday business practices would need a higher degree of knowledge" for liability to attach. *Camp*, 948 F.2d at 459 (citations omitted).

Applying these standards to the present case, the Court finds that Plaintiff has adequately pleaded facts sufficient to state that Defendant possessed the level of knowledge necessary to be held liable for aiding and abetting Northwestern's violations of 13(a) and 10(b) of the 1934 Act. The Complaint clearly alleges that Defendant's misrepresentations are a substantial factor in causing Northwestern's primary violations of section 13(a) and 10(b). The Complaint alleges that NCS' improper revenue entries caused Northwestern to materially overstate its reported fourth quarter net income by approximately 17% in the fourth quarter of 2001 and 1.97% and 1.10% in the in the first and second quarters of 2002. Additionally, the Complaint alleges that these misrepresentations were important because they represented the most recent financial information published before Northwestern was planning to sell more than $800 million in securities offerings in the fall of 2002 at a time when the company was publicly struggling with

its liquidity and cash flow.

Given this strong showing of substantial assistance, the Court finds that Plaintiff has sufficiently alleged the minimal level of knowledge necessary to state a claim for aiding and abetting liability. The Complaint alleges that throughout 2001 and the first two quarters of 2002, while Defendant served as chief executive officer of NCS, NCS inappropriately began to recognize revenue for many of its jobs using a percentage-of-completion accounting method which permits companies to, in some cases, recognize revenue while a job is in progress based on the amount of work performed. The Complaint further alleges that when NCS' financial results were short of forecast, Defendant often demanded that his accountant record 100% of the estimated revenue and costs for a job immediately without any signed contracts and before performing any work. (Compl. ¶¶ 50, 51.) Finally, despite receiving both verbal and written warnings from the accountant that false revenue had been recorded, the Defendant refused to authorize reversal of the false revenue and continued after the warnings to instruct that false revenue be recorded. (Compl. ¶¶ 62, 63, 66.) All of these alleged misrepresentations were made, the complaint alleges, when Defendant knew that NCS' financial statements would be consolidated into Northwestern's published financial statements. (Compl. ¶ 36.)

### D.   *Inadequate Pleading of the Facts - Count 9*

Defendant argues that Count 9 of Plaintiff's complaint should be dismissed because under *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955 (2007), Plaintiff has failed to plead facts sufficient to state a claim that Defendant aided and abetted Plaintiff's violation of section 13(b)(2)(B) of the 1934 Act.

The United States Supreme Court in *Twombly* stated that to survive a motion to dismiss, pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S.Ct. at 1965. Instead, a complaint must contain "enough facts to state a claim that is plausible on its face." *Id.* at 1974.

Applying this standard to the facts of this case, in order to state a claim that Defendant aided and abetted Northwestern's failure to devise and maintain a system of internal accounting controls, the Plaintiff must plead facts sufficiently alleging that: (1) Northwestern engaged in a primary violation of section 13(b)(2)(B); (2) Defendant knew of Northwestern's primary

violation of this section; and (3) Defendant substantially assisted Northwestern's violation of this law by failing to promptly correct Northwestern's failure to maintain an appropriate system of internal controls.

Evaluating these factors in turn, the Court finds that Plaintiff has pleaded facts sufficient to state a claim that Defendant aided and abetted Northwestern's violation of section 13(b)(2)(B). The Complaint alleges that Northwestern's internal accounting controls were insufficient in that they failed to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and did not reconcile recorded assets with actual assets at reasonable intervals. (Compl. ¶ 194.) Additionally, Plaintiff alleges that facts which permit the Court to infer that Defendant knew that Northwestern did not possess the internal accounting controls needed to detect misrepresentations on the financial statements of subsidiary companies such as NCS. After Defendant had been informed by his accountant of the overstatement in NCS' revenue and net income, Defendant refused to authorize accounting entries correcting these improper entries or inform Northwestern about the issue. (Compl. ¶ 63.) It was not until Northwestern conducted an internal audit of NCS in order to transfer the company to its telecommunications subsidiary, Expanets, that Northwestern uncovered the numerous misstatements on NCS' financial statements. (Compl. ¶ 101.) Finally, the fact that Defendant intentionally chose not to inform Northwestern of the revenue and net income misstatements or the potential need to restate Northwestern's financial results is evidence that Defendant substantially assisted the company's violations of these laws.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Dismiss Amended Complaint be denied.

Dated this 24th day of September, 2008.

BY THE COURT:

*[signature]*

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: *[signature: Colleen Schulte]*
　　　　　DEPUTY